1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    CARLOS C. HOUSH,                        Case No.  17-cv-04222-HSG (PR)

                    Petitioner,
8                                            ORDER DENYING PETITION FOR
                                             WRIT OF HABEAS CORPUS;
9          v.                                DENYING CERTIFICATE OF
                                             APPEALABILITY
10   DANIEL E. CUEVA, Acting Warden,[1]

11                  Respondent.

12         Before the Court is the *pro se* petition for a writ of habeas corpus filed pursuant to 28

13   U.S.C. § 2254 by Petitioner Carlos C. Housh, challenging the validity of a judgment obtained

14   against him in state court.  Respondent has filed an answer to the petition.  Dkt. Nos. 40, 40-1.

15   Petitioner has filed a traverse.  Dkt. No. 47.  For the reasons set forth below, the petition is denied.

16   I.     **PROCEDURAL HISTORY**

17         On August 24, 2012, Petitioner, who is African-American, was charged in the Marin

18   County Superior Court by amended information with committing multiple crimes against his

19   girlfriend[2] from June 27 to June 29, 2011.  Specifically, the first amended information alleged the

20   following charges: Count 1—rape; Count 2—sodomy by force; Count 3—corporal injury of a

21   cohabitant on June 27; Count 4—corporal injury of a cohabitant on June 28; Count 5—assault

22   with a deadly weapon using a "rock sculpture"; Count 6—assault with a deadly weapon using

23

24   ───────────────
     [1] Daniel E. Cueva, the current acting warden of the prison where Petitioner is incarcerated, has
25   been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

26   [2] The Court notes that Respondent indicates in the answer that "the sole victim of the charged
     crimes in this case was Kimberly Doe, but another woman 'Kim Doe,' also testified about violent
27   crimes that [Petitioner] had committed upon her."  *See* Dkt. No. 40-1 at 10 fn. 2.  The state
     appellate court does not name the victim in this case and only identifies her as "the victim"
28   throughout its opinion.  *See* Dkt. No. 43-8, Ex. 7.  Thus, to avoid any confusion, this Court will do
     the same.

scissors; Count 7—criminal threats; Count 8—dissuading a witness from reporting a crime; and Count 9—false imprisonment by violence. Volume 4, Clerk's Transcript ("CT") 524-534. The jury deadlocked on Count 1 (rape), Count 2 (sodomy by force), and Count 6 (assault using scissors), and those charges were dismissed. Volume 20, Reporter's Transcript ("RT") 1541-1546; 6CT 834-861. Petitioner was convicted of the remaining charges except for Count 5 (assault with the rock sculpture), for which he was convicted of misdemeanor assault as a lesser included offense. 7CT 1325-1329.

The trial court found that Petitioner had two prior serious felony convictions, including strike convictions under California's Three Strikes law for attempted robbery in California in 1981 and assault in Montana in 1996. 7CT 1326; 25RT 1691-1694. Petitioner moved to strike the priors under *People v. Superior Court (Romero)*, 13 Cal. 4th 497 (1996), and the trial court granted the motion as to the California conviction, but denied the motion as to the Montana conviction. 7CT 1326; 25RT 1691-1694. The trial court sentenced Petitioner to twenty-two years, eight months in state prison. 7CT 1328; 25RT 1691-1701.

On May 1, 2015, the California Court of Appeal modified Petitioner's prison sentence to stay the sentence on Count 9, but otherwise affirmed the judgment on direct appeal. Dkt. No. 43-8, Ex. 7.

On August 12, 2015, the California Supreme Court denied review. Dkt. No. 43-8, Ex. 9.

On July 25, 2017, Petitioner filed the instant habeas petition in this Court. Dkt. No. 1. Petitioner asserts ten grounds for federal habeas relief, all of which he contends were presented to the California Supreme Court: (1) the trial court committed prejudicial error when it denied his *Batson/Wheeler*[3] motion; (2) Petitioner's rights to present a defense, confrontation, and cross-examination were violated by the trial court's exclusion of the victim's December 2008 psychiatric report; (3) Petitioner was prejudiced by the victim's testimony referring to his

---

[3] *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *People v. Wheeler*, 22 Cal. 3d 258, 276-77 (1978), *disapproved in Johnson v. California*, 545 U.S. 162, 168-69 (2005) (holding proper standard for judging whether prima facie case had arisen was *Batson* "inference of discriminatory purpose" standard, not California's *Wheeler* "strong likelihood" test for successful prima facie showing of bias).

United States District Court
Northern District of California

1  custodial status at the time of trial and his prior imprisonment; (4) the trial court erred in admitting

2  evidence of his prior acts of domestic violence; (5) there was insufficient evidence presented at

3  trial to sustain the trial court's finding that the Montana conviction qualified as a strike under

4  California law; (6) Petitioner was entitled to a jury trial on the question of whether his Montana

5  conviction constituted a strike under California law; (7) sentencing error under California Penal

6  Code § 654; (8) the trial court committed prejudicial error in denying Petitioner's motion for a

7  new trial in light of newly discovered evidence; (9) cumulative error; and (10) sentencing error on

8  the basis of a "false conviction."[4]  *Id.* at 5-9.[5]

9       On September 29, 2017, Magistrate Judge Maria-Elena James issued an Order to Show

10  Cause.  Dkt. No. 5.  The case was then reassigned to this Court.  Dkt. No. 8.  On December 1,

11  2017, Respondent moved to dismiss the petition as untimely.  Dkt. No. 11.  The Court denied the

12  motion to dismiss and ordered Respondent to answer the petition on the merits.  Dkt. No. 27.  An

13  answer was filed on May 9, 2019, and a traverse was filed on June 25, 2019.  Dkt. Nos. 40, 40-1,

14  47.

15       Petitioner then filed an amended petition that contained only the claim that the California

16  Department of Corrections and Rehabilitation ("CDCR") erred in calculating his sentence when it

17  failed to remove the five-year enhancement.  Dkt. No. 66.  On April 29, 2020, the Court denied

18  Petitioner's request for leave to amend his petition to add the claim of sentencing error raised in

19  Dkt. No. 66 to the claims raised in the operative petition, docketed at Dkt. No. 1.  *See* Dkt. No. 67.

20  The Court's denial was without prejudice to re-filing after exhausting state court remedies.  *Id.* at

21  3.  The Court noted that "Dkt. No. 1 remains the operative petition."  *Id.*

22  **II.      STATEMENT OF FACTS**

23       The following factual background is taken from the May 1, 2015 opinion of the California

24

25  ───────────────

[4] Respondent argues that Petitioner did not present Claims 7 and 10 to the California Supreme

26  Court, but Respondent never filed a motion to dismiss for failure to exhaust these claims.
   Respondent concedes that under 28 U.S.C. § 2254(b)(2), the Court may reach the merits of these

27  claims even if they have not been exhausted.  Dkt. No. 40-1 at 36 n.9, 35-36.

28  [5] Page number citations refer to those assigned by the Court's electronic case management filing
   system and not those assigned by the parties.

1  Court of Appeal:[6]

2  A. *The Victim's Testimony*

3  The victim testified that Housh continually assaulted her in her home on June 27, 28, and 29, 2011.

4  She said that she and Housh had a romantic relationship beginning in July 2009, after she
5  was separated from her husband for a year. The victim worked as a geologist, but suffered
   from chronic pain after injuring her back. She was not working and had been mostly on bed
6  rest for years when she met Housh at a grocery store. She received financial assistance from
   her husband and father. Housh moved into her San Rafael home in December 2009, and
7  she supported him financially.

8  The victim said Housh first physically assaulted her at the end of December 2009, after she
   tried to break up with him. He shoved her into the walls of buildings and threw her to the
9  ground on an outing to San Francisco. They had consensual sex through the spring of 2010,
   but he forced her to have sex on a trip to Montana in May of that year. After that, he raped
10 her twice a week for about a year. The victim suffered her first "really big beating" from
   Housh on October 26, 2010, when he pinned her on the bed, slapped her on the sides of her
11 head, and suffocated her with a pillow for half a minute.

12 Prosecution investigator John George said that, when he interviewed the victim, she did not
   mention the December 2009 incident, or that she was raped in Montana in May 2010.

13 The victim reported the October 2010 incident to San Rafael Police Officer Castaneda on
14 November 2. She went to the police at her mother's insistence, and told the officer that she
   did not want to take the case to court because she feared public speaking. Castaneda testified
15 that the victim reported being punched in the head. When he asked her for a detailed
   statement, she said she did not want to get Housh in trouble, and that her mother had forced
16 her to make the report.

17 After the October 2010 incident, Housh's physical abuse became more frequent and violent.
   He would hit, slap, and kick her, and then force her to have sex. Housh got his own
18 apartment in February 2011, but never entirely moved out of the victim's home, and they
   went back and forth between the residences. She was twice "able to get him out of the
19 house," but he would "call and call and show up and eventually sweet-talk me into taking
   him back." She tried to break up with him at least half a dozen times, but stayed with him
20 because she was very lonely and isolated, and he was "almost my only human contact" at
   that time.

21 The victim said that on June 27, 2011, they argued, she told him she was breaking up with
22 him, and told him to leave her house. He hit her in the head and punched her in the arm.
   She tried to call 911, but the batteries had been removed from her land-lines, and she could
23 not find her cell phone. Housh assaulted her for hours, slapping her repeatedly, hitting her
   in the head, and kicking her in the shins. He karate-chopped her in the neck four or five
24 times, hit her in the forehead with a stainless steel coffee cup, and twisted and punched her
   arm. She screamed for help, and ran for the door many times, but he grabbed her and pulled

25 _____

26 [6] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*,
   853 F.3d 1049, 1055 (9th Cir. 2017). Based on its independent review, the Court finds that it can
27 reasonably conclude that the state appellate court's summary of facts is supported by the record
   and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366
28 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d
   984, 1000 (9th Cir. 2014), unless otherwise indicated in this order.

United States District Court
Northern District of California

her back by the hair.  Around 11:00 p.m. or midnight, he dragged her to the bedroom, threw her face down on the bed, held her there, and forced his penis into her anus for five or ten minutes.  She broke free, slid off the bed, and hit her head on the floor.  He picked her up, threw her face up on the bed, held her down, and forced his penis into her vagina for about five minutes.  He then dragged her to the bathroom, pushed her into the shower, ordered her to "[w]ash down there," and watched while she washed her vaginal and anal areas.  She went to bed, he turned on the TV and his computer, and she fell asleep.

The victim said that Housh continued hitting her off and on throughout the next day.  She had a rock sculpture in the shape of an apple that weighed several pounds, and he repeatedly dropped it onto her kneecaps from a height of about three feet.  He then moved to the other side of the living room, threw the sculpture at her, and hit her with it in the left thigh.  While she was lying in bed that night, he took a pair of embroidery scissors, held them up to her left eye for ten minutes, and said, "I'm going to cut your eye out so no other man will be interested in you."  When she later curled up into a fetal position on the bed, he punched her in her buttocks.  He was sitting at the end of the bed when she went to sleep that night, and was there when she woke up the next morning.

Housh continued hitting her that next day, June 29.  He hit her in the head and face, and kicked her legs.  When she was lying on the living room sofa, he grabbed her right foot and jabbed a letter opener into the ends of her toes under her toenails.  He used only moderate force, and while it hurt her, the letter opener did not cause any bleeding.  She tried to leave the house on each of the three days, but he prevented her by grabbing her hair.  At one point she got part way out the front door and screamed for help, but none came.  Housh told her that if she left he would find and kill her.

On June 29, the victim and Housh went to the drive-through at a Kentucky Fried Chicken, and continued going to stores and restaurants in the days that followed.  When she was asked why she did not try to escape during any of these excursions she answered, "You know, I had just been through a horrible beating and rape, and all my courage was gone.  I didn't think I would be able to call the police without him overhearing and stopping me, and I didn't think I would be able to run without him stopping me."

The victim and Housh went to the home of Housh's sister, Rosita Swearingen, in Antioch on July 4, where Swearingen had finished building a swimming pool.  Swearingen testified that she noticed a bruise on the victim's arm, and that the victim said she had bumped into something.  On July 9, the victim and Housh went to a park in Pittsburg for a barbeque with his family attended by about 80 people.  Housh's sister Carmen Jacobs testified that she had a friendly conversation with the victim at the party.  Housh's cousin Joaquin Cunhs testified that he spoke with her and Housh at the party and invited them to visit his home in Texas.  The victim said "that would be nice," and seemed to be having a good time at the party.  Swearingen and Jacobs said they saw the victim every day or two from June 27 to July 9.  Swearingen never saw her upset or distressed, and Jacobs saw no hint of discord between her and Housh.

Melinda Shrock testified for the prosecution as an expert on intimate partner battering.  She explained the reasons why victims of domestic violence delay reporting their abuse.  She described strategies used by abusers to control their victims, and the cycle of violence involved in those relationships.  She had spoken with over 5,000 domestic violence victims, and opined that false allegations of such abuse were uncommon.

Marcia Blackstock testified for the prosecution as an expert on rape trauma syndrome.  She explained the reasons why victims of sexual assault often delay reporting their abuse.

On July 11, with the help of her mother, the victim had the police called to her home and Housh arrested.

B. *The Victim's Psychiatric Condition and Treatment*

Dr. Michael Moscowitz was the victim's treating psychiatrist, and had been treating her since 2002. He testified as an expert on chronic pain and bipolar disorder. He explained that a person with bipolar disorder is one who has suffered at least one manic episode and one depressive episode. Characteristics of manic episodes include intensely disturbed interpersonal relationships, excessive pursuit of pleasurable activities, and paranoia. People having a depressive episode often become suicidal. "They don't have any motivation, they stay in bed, they cry a lot. They have very little emotional connection to anyone else."

Moscowitz testified that he initially diagnosed the victim with a depressive mood disorder associated with her medical condition, but changed the diagnosis in 2009 to bipolar disorder. In December 2008, Moscowitz observed that her mood was improving, but she "started accusing people of things and became more and more edgy . . . ." By March 2009, she was exhibiting manic symptoms, and by May 2009 Moscowitz concluded that she was manic. She stopped eating properly, and became uncharacteristically angry and sexually promiscuous. She "found herself waking up in places like the bedroom floor, not knowing how she got there." She said things that did not make any sense, such as "that she was writing stories about people dying violent deaths who were imposters. . . ." She did not want to take medication, "participated in very dangerous sexual liaisons," and "really had kind of gone off the deep end at that point."

The victim testified that she was over "a manic episode" when she met Housh in July 2009, but according to the testimony of Dr. Moscowitz, the episode was ongoing at that time. The victim contacted the police a number times during this manic period. San Rafael Police Officer Adams testified that the victim told him on May 30 that she feared her husband was tapping her phone and monitoring her calls. Adams said that she contacted him again on June 5, asking whether she should be concerned about terrorism because of files she had discovered on her computer. The victim testified that the files concerned Islam, and she was worried that her computer had been hacked. She went to the San Rafael Police Department on August 22 because text messages from Housh led her to believe, mistakenly, that he was trying to steal her identity.

Moscowitz thought the manic episode might have been caused by the victim's abruptly discontinued use of the numerous medications he had prescribed for her. A urine test in August 2009 showed none of the medications in her system. Her manic episode ended by September 2, 2009, after she resumed taking some of her medication. After some improvement, she became severely depressed in January 2010, "and then it would come and go after that." Moscowitz continued treating the victim, and testified that she had no further manic episodes. In June 2011, she was taking no medications that would have affected her memory or perceptions.

On cross-examination, Moscowitz confirmed that he prescribed the victim Abilify in the summer of 2009 to treat the "paranoia, delusions, grandiosity and hostility" she exhibited, and that she did not always follow his recommendations with that medication. He said that Abilify helps organize and clear the thoughts of someone who is depressed or manic, but that the victim was not on Abilify in June 2011. She reported physical, but not sexual, abuse by Housh before the June 2011 incidents. She also reported that her parents threatened to stop paying her mortgage unless she left Housh.

C. *Other Evidence*

Photos were taken of the victim's bruises when Housh was arrested on July 11. Moscowitz said that two of her prescribed medications could contribute to bruising, but had not done so in her case. Dr. Ryan O'Connor, an expert in emergency medicine and wound analysis, testified for the defense about the bruises that could be expected to result from injuries such as those described by the victim.

6

### D. *Kim Doe*

Kim Doe testified that she met Housh in 1987 and married him in 1989. They had two unplanned children together. He began to physically abuse her two and one-half months into their relationship, and hit her almost daily thereafter. "Anything" could set him off. For example, he would hit her "[i]f he found dust on the furniture, dishes in the sink, anything dirty in the house, kids not bathed or dressed." She stayed with him because she was afraid of what he would do to her if she left, and she married him because they had children together and some of her relatives would not interact with him unless they were married. During their relationship, he forced her to have vaginal, anal, and oral sex. She left him several times, but came back because he said "things would be different, but it never happened." She divorced him in 1992. In February 2011, she was convicted of a felony involving the sale of a controlled substance. In April 2011, she contracted an infection that affected her short-term memory.

Defense investigator Kristin Lewis testified that when she spoke with Kim in May 2012 and told her the victim was claiming that Housh sexually abused her, Kim "was very shocked and surprised and said that had never happened to her." Lewis said Kim also denied having been sexually abused by Housh when she spoke with her in July 2012. Kim testified she told Lewis that Housh had sexually assaulted her, and was not surprised by the charges against him "because of the type of person that [he] is." Prosecution investigator George testified that he had a phone conversation with Kim in November 2011, followed by more extensive interviews. In the phone call, Kim mentioned being physically but not sexually abused by Housh. But George said he asked her only a general question about their relationship, and did not specifically inquire about sexual abuse.

Rosemary H., Kim Doe's daughter and Housh's former stepdaughter, lived with Housh when she was ages three to six. Rosemary H. said that Housh slapped, punched, kicked, and threatened to kill Kim almost every day during that time. On October 16, 2011, she spoke with Housh. He told her that Kim was being subpoenaed to testify, and asked her to testify against Kim. He said "there would be money involved if I did," and that he would get it by suing the State of California if he was acquitted in this case. He did not tell her what her testimony should be.

### D. *C. Doe*

C. Doe testified that she met Housh at a party 13 years before the trial where she smoked a lot of marijuana and drank a beer. When she returned and drank her beer after going to the bathroom, it tasted funny. She felt funny, went to lie down in a bedroom, and fell asleep. When she woke up, Housh was on top of her, penetrating her vagina with his penis. She told him to get off of her, he did, and she left the party.

After the party, Housh twice came by the home where C. Doe was living with her boyfriend. The first time, her boyfriend's father was working at the house. He saw her fearful reaction when Housh approached, asked Housh to leave, and he left. The second time, C. Doe was home alone. Housh entered the house, cornered her in a bedroom, and pulled his pants down, but got up from the bed without penetrating her. C. Doe "d[id]n't know if he heard a noise or something." She grabbed a gun by the side of the bed, told him to get out of her house, and he ran away.

C. Doe did not report the rape at the party until she found out she was pregnant. She knew that Housh was the father of the child because she had no other sex with an African-American. When she obtained and renewed a restraining order against Housh, she checked a box for "stalking," rather than "rape," as the reason for the order.

1

### E.  *Housh's Alibi*

Housh's sisters testified that he was helping to build the pool at Swearengin's home on the days of the charged crimes.  Swearengin said that she bought the pool at Walmart with a debit card and cash.  She could not find a receipt, and her bank could not find a debit card statement for the purchase.  Jacobs was impeached with a 1998 conviction for felony welfare fraud.  Housh did not testify.

*People v. Housh*, No. A138873, 2015 WL 1982695, at *1-5 (Cal. Ct. App. May 1, 2015).

## III.    DISCUSSION

### A.    Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established Federal law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and

nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state

court identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal

habeas court may not issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal law erroneously

or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court

may not overrule a state court for simply holding a view different from its own, when the

precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17

(2003).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating

state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the

above standards on habeas review, the Court reviews the last reasoned decision by the state court.

*See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th

Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

In its unpublished disposition issued on May 1, 2015, the state appellate court addressed

the merits of all but two of Petitioner's ten claims, Claims 7 and 10, which are unexhausted.[7]

*Housh*, 2015 WL 1982695, at *5-19. Therefore, the last reasoned decision as to these claims is the

California Court of Appeal's unpublished disposition. *See Wilson*, 138 S. Ct. at 1192; *Canedy*,

706 F.3d at 1156.

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a

heightened level of deference a federal habeas court must give to state court decisions. *See Hardy

v. Cross*, 565 U.S. 65, 66 (2011) (per curiam); *Harrington v. Richter*, 562 U.S. 86, 97-100 (2011);

*Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam). As the Court explained, "[o]n federal

habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings'

---

[7] As mentioned above, although Petitioner failed to exhaust Claims 7 and 10, the Court may deny an unexhausted claim on the merits. *See* 28 U.S.C. § 2254(b)(2).

and 'demands that state-court decisions be given the benefit of the doubt.'" *Felkner*, 562 U.S. at 598 (citation omitted).  With these principles in mind, the Court addresses Petitioner's claims.

## B.     Petitioner's Claims

### 1.     Claim 1: Denial of *Batson/Wheeler* Motion

Petitioner claims that he was denied his right to equal protection because the prosecutor's peremptory challenge of African-American prospective juror G.W. (hereinafter "G.W.") was racially motivated, such that the trial court erred in denying his *Batson/Wheeler* motion.  Dkt. No. 1 at 5.

### a.  State Court Opinion

The state appellate court described the factual background of this claim as follows:

During voir dire, the court noted that Housh is African-American, that the victim is Caucasian, and that those facts were irrelevant to the case.  Defense counsel made a reference to the book *To Kill a Mockingbird* in connection with past trouble "in the criminal justice system with handling black versus white crimes," and asked whether people continued to "carry their resentments about race into the jury box."  G.W. was the only prospective African-American juror seated in the jury box for questioning.

G.W. recalled, in connection with *To Kill a Mockingbird*, hearing adults when she was growing up discussing whether an African-American man could get a fair trial, especially in the South.  However, she said, "that's 50 years ago, and I think there's been a lot of positive changes since then."  She had "come to respect" the criminal justice system, citing her experiences watching *Law & Order*, and having friends who had brushes with the law. She said that she would have no racial bias in favor of Housh, adding that she thought she would have voted to convict O.J. Simpson if she had been a juror in his case.  She had sat on two juries, one in a criminal case, and verdicts were reached in those cases.

G.W. grew up as an "Army brat," and was an Air Force veteran.  She had retired the year before from the Department of Veteran Affairs Medical Center in San Francisco, where she worked primarily as an individual counselor and group therapist.  She trained for that work in the Air Force, went to work for the VA, and completed her training by taking psychology classes at night and earning a college degree.  Her work involved diagnosing mental health problems and determining the veracity of people she counseled.

The admissibility of the victim's bipolar disorder was being debated at the time of voir dire, and the court had not ruled on it.  The prosecution exercised a peremptory challenge against another prospective juror, M.H., who was a retired psychiatric nurse, immediately before G.W. was seated in the jury box.  In response to defense questioning, M.H. said she often had to judge patients' credibility, and acknowledged feeling sympathy for them.  When the prosecutor asked M.H. whether she could put aside her specialized knowledge if called upon to evaluate a doctor's expert opinion in the case, she answered, "[T]hat's part of the whole thing that we do, is that you have to sift through the material and see what's there."

When G.W. was questioned by the court, she noted that M.H.'s "professional experiences are pretty much similar" to hers, and "wonder[ed] how I would answer some of those questions that [were] directed towards her."  The prosecutor asked G.W., "Do you feel

10

comfortable with . . . putting aside your expertise on any of the matters that we have discussed and listening to the expert, if there is one, testify based on what their expertise is?" G.W. answered, "Yes, I do."

The prosecutor did not initially excuse G.W. After she was questioned, both sides exercised peremptory challenges against other jurors, and the parties passed on further challenges. It appeared at that point that only alternate jurors remained to be selected, but then one of the jurors was excused for cause, and the court recessed for lunch. When court reconvened, the court noted that G.W. was absent, and voir dire resumed. When peremptory challenges resumed, the prosecutor excused G.W., and the defense made a *Batson/Wheeler* motion.

The court observed that excusing G.W. was consistent with the prosecution's pattern of excusing jurors with mental health experience, including M.H. and two other prospective jurors. One had worked as a mental health counselor in the psychiatric unit of Marin General Hospital for the last 13 years. He had taken a lot of psychology courses, and his job was to "help counsel and stabilize people that come in under some mental health crisis, whether they are bipolar, schizophrenic." As with G.W. and M.H., the prosecutor asked the mental health counselor before excusing him whether he could put aside his professional knowledge and experience when he evaluated expert testimony in the case. The other excused juror with mental health experience worked as a life skills coach for people with mental disabilities. The court pointed out that G.W. had herself noted the similarity between her and M.H. The court found that the two female jurors identified by the defense were not "similarly situated" to G.W.

The court found no inference of a discriminatory purpose from the removal of G.W., and thus denied the *Batson/Wheeler* motion based on defense failure to make a prima facie case, but invited the prosecutor to state the reasons for her decision. The prosecutor confirmed that her main reasons for excusing G.W. were her education and profession. The prosecutor explained, among other things: "Initially, when we were passing or challenging jurors, I did pass on [G.W.]. At that point, I had sort of a fight within myself whether or not I wanted to keep her, because she did appear, initially, to be a reasonable person; however, so did [M.H.]. And upon further reflection over the lunch hour, thinking about it a little bit more, remembering that she had a psychology bachelor's degree, the type of people that she worked with, the fact that she might have specialized knowledge in medications, those are all things that affected my determination as to whether or not to kick her after all."

*Housh*, 2015 WL 1982695, at *5-7.

The state appellate court then denied this claim as follows:

We agree with the trial court's ruling on the *Batson/Wheeler* motion for a number of reasons.

First, and virtually conclusively, the prosecutor's initial decision to accept G.W. as a juror effectively negated any inference that she was acting on the basis of an improper group bias. If the prosecutor was bent on excluding African-American jurors, she would have challenged G.W. before the selection of jurors, other than alternates, appeared to be complete.

Second, the record supported the court's finding that jurors like G.W. with a background in psychology were consistently excused, regardless of race. The defense made no showing to the contrary. While the *Batson/Wheeler* inquiry did not reach beyond the first stage, the prosecutor's explanation for removing G.W. confirmed the court's identification of a race-neutral reason for the challenge. Housh argues that G.W. was not similarly situated to M.H., the juror with whom she was most closely compared, because M.H. said that one of her children was a court reporter who lived in Marin County. Housh speculates from this statement that M.H.'s child worked in the Marin courts, was familiar with counsel and

possibly the trial judge in the case, and may have expressed opinions about them to M.H. Even if all of this conjecture were true, it would not change the fact that M.H. and G.W. had both worked in mental health and could have been removed for that same reason.  No two prospective jurors are exactly alike, and possible additional reasons for excluding M.H. did not raise an inference that G.W. was excused because of her race.

Third, while a prosecutor may excuse a prospective juror "even for arbitrary or idiosyncratic reasons" as long as they are nondiscriminatory (*People v. Lenix* (2008) 44 Cal. 4th 602, 613), the reason given here—that prospective jurors' backgrounds in psychology could color their perceptions of testimony on that subject—was similar to those that have been recognized as valid grounds for peremptory challenges.  (See, e.g., *People v. Landry* (1996) 49 Cal. App. 4th 785, 790 ["'very bad experiences'" with jurors who had a background in psychiatry or psychology]; *People v. Gutierrez* (2002) 28 Cal. 4th 1083, 1124 [concern that juror "would place too much weight on the opinion testimony of psychologists"]; see also *People v. Streeter* (2012) 54 Cal. 4th 205, 225, citing *People v. Clark* (2011) 52 Cal. 4th 856, 907 ["peremptory challenge properly based on juror's experience in counseling or social services"].)

Finally, Housh made only a weak prima facie showing of unlawful group bias.  He could point to only G.W. as an allegedly improper challenge.  "'[E]ven the exclusion of a single prospective juror may be the product of an improper group bias.  As a practical matter, however, the challenge to one or two jurors can rarely suggest a pattern of impermissible exclusion.'"  (*People v. Bell* (2007) 40 Cal. 4th 582, 598.)  Moreover, Housh identified no similarities between G.W. and the two other jurors he alleged were comparable, and retained by the prosecution, other than age and gender, unexplained equivalent "background," "reactions," and "reasoning," and the fact that those jurors, like G.W., said that race would not enter into their decisions.  Given the generality of these claims, deference to the trial court's opportunity to observe the other jurors is particularly appropriate.  (*People v. Holt, supra,* 15 Cal. 4th at p. 651.)

The *Batson/Wheeler* motion was correctly denied.

*Id.* at *7-8.

### b.  Applicable Federal Law

The use of peremptory challenges by either the prosecution or defense to exclude cognizable groups from a jury may violate the Equal Protection Clause.  *See Georgia v. McCollum*, 505 U.S. 42, 55-56 (1992).  The Supreme Court has held that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race.  *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986).[8]  *Batson* permits prompt rulings on objections to peremptory challenges under a three-step process:

First, the defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge based on race "by showing that the totality of the relevant facts gives rise to

---

[8] The California procedural counterpart to *Batson* is *People v. Wheeler*, 22 Cal. 3d 258 (1978).  *See McDaniels v. Kirkland*, 813 F.3d 770, 773 (9th Cir. 2015) (en banc).

United States District Court
Northern District of California

1    an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94.

2         Second, if this showing is made, the burden then shifts to the prosecutor to offer a race-

3    neutral explanation for the strike. *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir.

4    2000).

5         Finally, the trial court must determine whether the defendant has carried his burden of

6    proving purposeful discrimination. *Id.* at 98; *Wade*, 202 F.3d at 1195; *Green v. Lamarque*, 532

7    F.3d 1028, 1030 (9th Cir. 2008) ("Third, if the prosecutor offers a race-neutral explanation, the

8    trial court must decide whether the defendant has proved the prosecutor's motive for the strike was

9    purposeful racial discrimination."). To fulfill its duty, "the trial court must evaluate the

10   prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the

11   available tools including its own observations and the assistance of counsel." *Mitleider v. Hall*,

12   391 F.3d 1039, 1047 (9th Cir. 2004); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003). "As part

13   of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror

14   analysis—that is, it must 'compare African American panelists who were struck with those non-

15   African American panelists who were allowed to serve.'" *Jamerson v. Runnels*, 713 F.3d 1218,

16   1224 (9th Cir. 2013) (quoting *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)). "The

17   prosecution's treatment of minority jurors as compared to its treatment of nonminority jurors is

18   among the facts indicative of the presence of a purpose to discriminate." *McDaniels v. Kirkland*,

19   813 F.3d 770, 778 (9th Cir. 2015) (en banc) (citing *Miller-El v. Dretke* ("*Miller-El II*"), 545 U.S.

20   231, 241 (2005)). Ultimately, the defendant has the burden of persuading the court that the strike

21   was racially motivated. *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citing *Purkett v. Elem*, 514

22   U.S. 765, 768 (1995)).

23        Where the state court has failed in its duty to conduct a comparative juror analysis, such an

24   analysis should be undertaken *de novo*, rather than by remanding the case to the state courts to do

25   so. *LaMarque*, 532 F.3d at 1031 (citing *Miller-El II*, 545 U.S. at 241). Once the federal court has

26   undertaken the comparative juror analysis, it must reevaluate the state decision in light of that

27   analysis and any other evidence pointing toward purposeful discrimination in order to determine

28   whether the state was unreasonable in finding the prosecutor's race-neutral explanations to be

genuine.  *Castellanos v. Small*, 766 F.3d 1137, 1148-51 (9th Cir. 2014).  Where a state court conducted an analysis of the characteristics of a dismissed juror and other jurors and determined that the prosecutor did not exercise her peremptory challenges in a discriminatory manner, AEDPA deference applies and a federal court need not undertake comparative analysis de novo. *Briggs*, 682 F.3d at 1171 n.6.

In deciding whether the defendant has made the requisite showing to satisfy the first *Batson* step, the trial court should "consider all relevant circumstances."  *Batson*, 476 U.S. at 96. A "pattern of strikes" against black jurors included in the particular venire may give rise to an inference of discrimination.  *Id.* at 97.  A defendant satisfies the requirements of *Batson*'s first step by "producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  *Johnson v. California*, 545 U.S. 162, 170 (2005).

In evaluating the race-neutral explanation, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Hernandez v. New York*, 500 U.S. 352, 355-62 (1991) (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony).  It should also keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility.  *See Rice*, 546 U.S. at 340-41; *Lewis*, 321 F.3d at 830.  Because determinations of credibility and demeanor of the prosecutor and jurors lie "'peculiarly within [the] trial judge's province,'" the trial court's ruling on the issue of discriminatory intent is entitled to great deference and must be sustained unless clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 476-82 (2008) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)); *see Felkner v. Jackson*, 562 U.S. 594, 596-98 (2011) (per curiam) (reversing court of appeals' "inexplicable" and "unexplained" finding that proffered race-neutral explanations for peremptory strikes were insufficient to outweigh evidence of purposeful discrimination).

A federal habeas court need not dwell on the first step of the *Batson* analysis if the matter has proceeded to the second or third step.  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie

showing becomes moot." *Hernandez*, 500 U.S. at 359. Once a district court has found intentional discrimination (the third *Batson* step), it cannot "reevaluate" that finding based simply on a reassessment of the strength of the initial prima facie case. *United States v. Esparza-Gonzalez*, 422 F.3d 897, 906-07 (9th Cir. 2005) (applying *Hernandez* and a case upon which it relied, *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review. *See Purkett v. Elem*, 514 U.S. 765, 769 (1995). So are the findings of the state appellate court. *See Mitleider*, 391 F.3d at 1050. Under AEDPA, this means that where a challenge to the state court's factual determination is based on extrinsic evidence or evidence presented for the first time in federal court, under 28 U.S.C. § 2254(e)(1) the state court's findings of discriminatory intent are presumed sound unless the petitioner rebuts the presumption by clear and convincing evidence. *Kesser v. Cambra*, 465 F.3d. 351, 368 n.1 (9th Cir. 2006). Additionally, where review of the state court's factual determination is based entirely on information that was contained in the state court record, under 28 U.S.C. § 2254(d)(2) the federal court must defer to the state court's conclusion that there was no discrimination unless that finding was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Cook v. LaMarque*, 593 F.3d 810, 816 (9th Cir. 2010) (citing 28 U.S.C. § 2254(d)(2)) (even though prosecutor gave both persuasive and unpersuasive justifications for strikes, court could not conclude state court's finding of no discrimination was objectively unreasonable where review of voir dire transcript and juror questionnaires showed the most significant justifications in each case were entirely sound); *Kesser*, 465 F.3d at 368 (finding state court of appeal's conclusion that a strike was not racially motivated was unreasonable determination under 28 U.S.C. § 2254(d)(2), and "even satisfie[d] the more demanding standard" of section 2254(e)(1)). Therefore, a federal habeas court can only grant habeas relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338. "[I]n evaluating habeas petitions premised on a *Batson* violation, 'our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported

15

1    by substantial evidence, we must uphold it.'"  *Jamerson*, 713 F.3d at 1225 (citing *Briggs*, 682 F.3d

2    at 1170).  The standard is demanding, but not insatiable.  *Miller-El II*, 545 U.S. at 240.  A federal

3    habeas court will not be bound by state court factual findings unsupported in the record or refuted

4    by it, for example.  *See e.g.*, *Castellanos*, 766 F.3d at 1149-50 (concluding that prosecutor's race-

5    neutral reasons were pretextual after conducting comparative analysis and looking at totality of

6    relevant circumstances); *Kesser*, 465 F.3d at 358 (granting writ based upon a finding that the state

7    court, in "failing to consider comparative evidence in the record before it that undeniably

8    contradicted the prosecutor's purported motivations, unreasonably accepted his nonracial motives

9    as genuine").

                                    c.   **Analysis**

11           Petitioner argues that the trial court committed prejudicial error when it ruled that the

12   exercise of a peremptory challenge against G.W. was race-neutral.  Dkt. No. 43-8, Ex. 4 at 49.

13   Respondent argues that the state appellate court reasonably concluded that Petitioner failed to

14   make a prima facie showing of discrimination under *Batson*'s first step, and that there was no

15   purposeful discrimination under *Batson*'s third step.  Dkt. No. 40-1 at 18-23.

16           Because the state courts proceeded to consider the prosecutor's proffered race-neutral

17   explanations for striking G.W. and determined that the peremptory challenge was not racially

18   motivated, this Court will proceed directly to the ultimate *Batson* question of whether Petitioner

19   has shown purposeful discrimination.  *See Hernandez*, 500 U.S. at 359.

20           The issue is whether the third element of a prima facie case of discrimination is met,

21   namely whether the circumstances of the case raise an inference that the challenge was based on

22   race.  In *Batson*, the Supreme Court held that, in "deciding whether the defendant has made the

23   requisite showing, the trial court should consider all relevant circumstances," and noted that a

24   "prosecutor's questions and statements during voir dire examination and in exercising his

25   challenges may support or refute an inference of discriminatory purpose."  *Williams v. Runnels*,

26   432 F.3d 1102, 1107 (9th Cir. 2006) (quoting *Batson*, 476 U.S. at 96-97).  The Supreme Court

27   reiterated in *Johnson* that a defendant may rely on "any other relevant circumstances" to raise an

28   inference of discriminatory purpose.  545 U.S. at 170.  The Court thus now turns to the third

United States District Court
Northern District of California

*Batson* step and evaluates whether the state appellate court was objectively unreasonable in making a credibility determination that was supported by substantial evidence, *Jamerson*, 713 F.3d at 1225, and whether there is evidence of purposeful discrimination, *see Hernandez*, 500 U.S. at 355-62.

In evaluating Petitioner's *Batson* claim, the Court reviews the state appellate court's opinion on direct appeal as the last reasoned decision of the state court. *Ali v. Hickman*, 584 F.3d 1174, 1181 n.5 (9th Cir. 2009). The state appellate court's findings on the issue of discriminatory intent are findings of fact entitled to AEDPA deference under § 2254(d)(2). *Briggs*, 682 F.3d at 1170 and n.4.

Here, the state appellate court's determination that the record supported the trial court's finding that the prosecutor did not excuse G.W. based on her race was not objectively unreasonable. *See Rice*, 546 U.S. at 341-42 (even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination"). The state appellate court reasonably determined that the prosecutor's explanation for excusing G.W.—her education and professional background in psychology—was a race-neutral reason, and that the trial court's finding—that the explanation was genuine and consistent with the prosecutor's excusal of similarly situated prospective jurors—should be accorded deference. *See United States v. Maxwell*, 473 F.3d 868, 872 (9th Cir. 2007) (inference that juror's employment might make juror more sympathetic to criminal defendant is a valid, race-neutral reason for striking juror); *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987) (excluding jurors because of their profession is wholly within prosecutor's prerogative); *United States v. Smith*, 223 F.3d 554, 569 (7th Cir. 2000) (accepting a prosecutor's assertion that a "social worker type" on the jury might be too sympathetic to the defendant). In reaching its conclusion, the state appellate court stated as follows:

> [W]hile a prosecutor may excuse a prospective juror "even for arbitrary or idiosyncratic reasons" as long as they are nondiscriminatory (*People v. Lenix* (2008) 44 Cal. 4th 602, 613), the reason given here—that prospective jurors' backgrounds in psychology could color their perceptions of testimony on that subject—was similar to those that have been recognized as valid grounds for peremptory challenges.

*Housh*, 2015 WL 1982695, at *8.

United States District Court
Northern District of California

1    The state appellate court also conducted a comparative juror analysis as to G.W. and found

2    that "the record supported the [trial] court's finding that jurors like G.W. with a background in

3    psychology were consistently excused, regardless of race." *Id.* at *7.  In reaching this

4    determination, the state appellate court noted that the prosecution exercised peremptory challenges

5    on the same basis against three other prospective jurors, including M.H., a retired psychiatric nurse

6    who was excused immediately before G.W. was seated in the jury box.  Moreover, while G.W.

7    was the only African-American prospective juror, there is no evidence in the record that the

8    prosecutor selected a non-black juror for the panel to whom the prosecutor's reasons for striking

9    G.W. applied "just as well."  *Cf. Miller-El II*, 545 U.S. at 241 (where prosecutor's reasons for

10   striking a black juror apply "just as well" to a non-black juror who is selected for the panel, "that

11   is evidence tending to prove purposeful discrimination" that should be considered in assessing the

12   genuineness of prosecutor's proffered explanations).

13   Petitioner contends that G.W. was not similarly situated to M.H. because M.H. stated

14   during voir dire that one of her children was a court reporter who lived in Marin County.

15   However, as the state appellate court explained:

16       Housh speculates from this statement that M.H.'s child worked in the Marin courts, was
         familiar with counsel and possibly the trial judge in the case, and may have expressed
17       opinions about them to M.H.  Even if all of this conjecture were true, it would not change
         the fact that M.H. and G.W. had both worked in mental health and could have been removed
18       for that same reason.

19   *Housh*, 2015 WL 1982695, at *7.  Although the prosecutor's reasons for the strike must relate to

20   the case to be tried, the state court need not believe that "the stated reason represents a sound

21   strategic judgment" to find the prosecutor's rationale persuasive; rather, it need be convinced only

22   that the justification "should be believed."  *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006)

23   (en banc) (quoting *Hernandez*, 500 U.S. at 365).  The state court reasonably found that it should.

24   Therefore, the state appellate court reasonably applied clearly established Supreme Court authority

25   which, as the Ninth Circuit has recognized, requires the trial court to assess the plausibility of a

26   prosecutor's reasons in light of the evidence.  *See Gonzalez v. Brown*, 585 F.3d 1202, 1207 (9th

27   Cir. 2009).  In evaluating Petitioner's *Batson* claim under AEDPA's "doubly deferential"

28   standard, it simply cannot be said that "the state appellate court was objectively unreasonable in

1    concluding that [the] trial court's credibility determination was supported by substantial

2    evidence . . . ." *Briggs*, 682 F.3d at 1170 (citing *Rice*, 546 U.S. at 338-42).

3          Nor was the state court's denial of this claim based on an unreasonable determination of

4    the facts in light of the evidence presented in the state court proceeding.  Under Ninth Circuit

5    authority, habeas relief on a *Batson* claim is warranted if the state court failed to consider evidence

6    in the record "that undeniably contradicted the prosecutor's purported motivations," and the state

7    court "unreasonably accepted his nonracial motives as genuine."  *Kesser*, 465 F.3d at 358.  On

8    habeas review, this Court considers "whether a prosecutor's justifications are contrary to the

9    evidence in the record, such as being 'implausible or fantastic,' based on mischaracterizations of a

10   prospective juror's testimony, or belied by a comparative juror analysis."  *Sifuentes*, 825 F.3d at

11   518.  "Conversely, we consider whether evidence in the record shows that at least some of the

12   prosecutor's reasons were 'permissible and plausible.'"  *Id.* (citing *Collins*, 546 U.S. at 341).

13   Here, the state appellate court directly addressed the third *Batson* step, conducted a comparative

14   juror analysis as to G.W., and considered other evidence in the trial record in determining that the

15   race-neutral justifications for removing jurors M.H. and G.W. were plausible and supported by the

16   record.  Moreover, after reviewing the voir dire transcripts, the state appellate court did not find—

17   and Petitioner does not point to—any other non-African American juror who was similarly

18   situated to G.W. and remained on the jury.  The state appellate court determined that Petitioner

19   "identified no similarities between G.W. and the two other jurors he alleged were comparable, and

20   retained by the prosecution, other than age and gender, unexplained equivalent 'background,'

21   'reactions,' and 'reasoning,' and the fact that those jurors, like G.W., said that race would not enter

22   into their decisions."  *Housh*, 2015 WL 1982695, at *8.  Thus, the state appellate court's finding—

23   that there was no discriminatory intent—was based on a reasonable determination of the facts in

24   light of the evidence presented in the trial court.

25         Petitioner has failed to come forward with clear and convincing evidence to rebut the

26   presumption that the state court's conclusion was a reasonable one.  Nor has he otherwise shown

27   why this Court should accept his interpretation of the record over the trial court's credibility

28   determination.  *See Miller-El*, 545 U.S. at 240.  Therefore, this Court finds reasonable the state

1   appellate court's deference to the trial court's "opportunity to observe the other jurors." *Housh*,

2   2015 WL 1982695, at \*8.  As such, the state court was reasonable in concluding that the

3   prosecutor was not substantially motivated by discriminatory intent to challenge G.W.  *See Cook*,

4   593 F.3d at 816 (finding state court's conclusion that strike was not racially motivated was

5   reasonable determination under 28 U.S.C. § 2254(d)(2)).

6          Accordingly, the state appellate court's rejection of this claim was not based on an

7   unreasonable determination of the facts in light of the evidence presented in the state court

8   proceeding.  28 U.S.C. § 2254(d)(2).  Petitioner is not entitled to relief on Claim 1, and it is denied.

9                    **2.    Claim 2: Exclusion of Victim's Psychiatric Report**

10         Petitioner next contends that his rights to present a defense, confrontation, and cross-

11  examination were violated by the trial court's "erroneous restriction on the use of [the victim]'s

12  psychiatric records," specifically, her psychiatrist Dr. Moskowitz's December 2008 Psychiatric

13  Report.[9]  Dkt. No. 1 at 5.

14  _____

15  [9] Three state law evidence rules were implicated by the trial court's rulings concerning the
    exclusion of evidence relating to the victim (discussed in this section) and the admission of
16  evidence relating to Petitioner (discussed in Claim 4).

17  California Evidence Code § 352 provides: "The court in its discretion may exclude evidence if its
    probative value is substantially outweighed by the probability that its admission will
18  (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of
    confusing the issues, or of misleading the jury."  Cal. Evid. Code § 352.

19  California Evidence Code § 1101(a) provides the general rule that evidence of a person's character
20  (such as a prior bad act) is generally inadmissible to prove a defendant's conduct on a specified
    occasion.  Cal. Evid. Code § 1101(a).  Subsection (b) provides several exceptions to that general
21  rule: "Nothing in this section prohibits the admission of evidence that a person committed a crime,
    civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent,
22  preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her
    disposition to commit such an act."  Cal. Evid. Code § 1101(b).

23  California Evidence Code § 1109 permits the admission of evidence of the petitioner's offenses
24  involving domestic violence, subject to a balancing test of the evidence's probative value against
    its prejudicial effect, in accordance with section 352.  Cal. Evid. Code § 1109(a)(1).  Subsection
25  (a)(1) of Section 1109 provides:

26         (a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the
           defendant is accused of an offense involving domestic violence, evidence of the
27         defendant's commission of other domestic violence is not made inadmissible by Section
           1101 if the evidence is not inadmissible pursuant to Section 352.

28  *Id.*

United States District Court
Northern District of California

### a.   State Court Opinion

The state appellate court described the factual background of this claim and rejected it as

follows:

> B. *Exclusion of Dr. Moskowitz's December 2008 Psychiatric Report*
> Although the court denied the prosecution's in limine motion to exclude any testimony about the victim's mental health, Housh argues that the court erred when it excluded evidence concerning Dr. Moskowitz's December 16, 2008 notes of her treatment.
>
> (1) *Record*
> The court ruled that the defense could present evidence of the victim's bipolar disorder to show that she was paranoid, delusional, or had problems perceiving or remembering events. Housh subpoenaed Dr. Moscowitz's records of her treatment after 2006, and Moscowitz objected to the disclosure.  The court agreed to examine the records and determine which were discoverable.  During Moscowitz's trial testimony, the parties and the court discovered that the court had inadvertently failed to provide the parties with Moscowitz's December 16, 2008 notes, which read in relevant part as follows:
>
> "[The victim] is grinding her teeth.  She is writing angry letters to a lot of people.  'It's around men and sex.'  The letters are . . . to . . . her father, her husband, her stepfather, 'men who have abused me in the past.'  She doesn't send the letters.  A theme is emerging.  She feels that her father and stepfather committed 'covert incest.'  Her father made her be like a 'little wife.'  He would unburden himself of his problems with her.  His (*sic*) father would tell her of his sexual frustrations.  Her mother and father were not together at that time.  She states that her stepfather makes inappropriate remarks about her sexually, causing her mother to make a suicide attempt on one occasion[].  She reveals a subsequent strange relationship with men.  Her stepfather remains sexually inappropriate.  A recent episode degenerated into physical violence."
>
> Housh sought to question Moscowitz about these observations, arguing that they exhibited "fantastical thinking" by the victim "about men and about abuse."  Before trial Housh had asked the court to allow questioning about the victim's allegedly false claim that, shortly before she began her relationship with Housh, her stepfather "'made a pass' or 'put his hand up her skirt' or in some way attempted to touch her genitals."  During discussions on in limine motions, defense counsel said the stepfather initially denied the allegation, but then said "[i]t happened" and he was "very ashamed" of it.  The court excluded the allegation under Evidence Code section 352, saying, that "it may not be false.  And we are not going to have a trial involving the truth of that allegation for the minimal relevance it may have here."
>
> When the parties were arguing admissibility of the December 2008 report, it emerged that the stepfather admitted trying to kiss her but denied putting his hand up her skirt, and that the defense had decided not to present evidence of his conduct.  After discussion of the December 2008 report, the court said it would allow the defense to question the victim about her stepfather's alleged physical violence, but excluded the report unless it could be used to impeach her testimony on the subject.
>
> The court thus prohibited Housh from eliciting testimony about statements in the December 2008 report involving the victim's husband and father.  The court acknowledged that prior false allegations of sexual activity might be admissible, but observed that "this is really vague stuff in here about letters she's writing, sending to nobody."  The court noted that the report did not specify any abuse by the victim's husband, and mentioned nothing more than inappropriate remarks by her father.  The court told the defense: "[I]f you had evidence that she was delusional and thinking other people have abused her, that might be fair and

relevant, but this single paragraph in the medical report doesn't leave us with that conclusion. It only leaves us with speculation . . . . I think under Evidence Code section 352, I have let you go into quite a bit about her bipolar disorder and other delusional thoughts that she might have had in the past. I don't think that this paragraph opens the door to anything else at this point in time. [¶] So I will preclude you from asking Dr. Moskowitz about her letters or her statements there. I think the prejudice to the People outweighs any probative value."

Housh moved the next day for reconsideration of this evidentiary ruling, supported by reports of defense investigator Lewis. Lewis stated that she spoke with the victim's father, and that he denied sexually, physically, or emotionally abusing her. Lewis said she spoke with her husband, who also denied any such abuse. The husband said the father abused the victim "emotionally," but never sexually or physically. The court reaffirmed its prior ruling, stating, "I don't see anything in here that gives rise to even a hint that there is a potential conclusion that [she] made false allegations. What we have here is a medical report in which she tells the doctor that she wrote letters to nobody, for nobody that were delivered to nobody. They seem to be some sort of letters that she wrote to vent . . . . [¶] . . . [¶] I maintain that under Evidence Code section 352 . . . there's no probative value, and the unfairness in terms of the speculation that would be invited against the alleged victim here is undue prejudice and supports my ruling of yesterday."

The defense did not call the victim as a witness to question her about her stepfather's alleged physical violence.

*Housh*, 2015 WL 1982695, at *8-9.

The state appellate court then set forth the relevant state and federal law, and it denied this claim as follows:

(2) *Analysis*
A court has "'broad discretion' under Evidence Code section 352 'to exclude even relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, o[f] confusing the issues, or of misleading the jury." ' " (*People v. Merriman* (2014) 60 Cal. 4th 1, 60.) "An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown "'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" [Citation.]" (*Id.* at p. 74; see also *People v. Vargas* (2001) 91 Cal. App. 4th 506, 545, 543 [trial courts "have wide discretion in determining the relevancy of evidence"; no abuse of discretion under Evid. Code, § 352 unless court " ' "exceeds the bounds of reason, all of the circumstances considered" ' "].)

There was no abuse of discretion here, and no violation of Housh's constitutional rights (see, e.g., *People v. Abilez* (2007) 41 Cal. 4th 472, 503 [discretionary evidentiary ruling did not violate right to present a defense]; *People v. Gurule* (2002) 28 Cal. 4th 557, 620 [ordinary rules of evidence generally do not infringe on the right to present a defense; rejecting argument that restricted cross-examination violated rights to confrontation, due process, and a fair trial]; *People v. Cunningham* (2001) 25 Cal. 4th 926, 999 [exclusion of defense evidence on a subsidiary point is not a deprivation of due process]).

The court could reasonably conclude that the December 2008 report had negligible probative value. The report named three alleged abusers: the victim's stepfather, father, and husband. The defense declined to explore allegations involving the stepfather and, as the court pointed out, the report referred only to inappropriate remarks by the father, and

did not identify any of the abuse that may have been inflicted by the husband. The victim did not send any of the letters describing this alleged abuse. The court could reasonably conclude that the December 2008 report, without more, would only invite speculation by the jury about the abuse involved and whether it occurred. As the court told the defense: "I am not curtailing your investigation. You can certainly try to find out if she has made any false allegations against her husband or her father, or other allegations against the stepfather. But I don't think that this statement [the December 2008 report], in and of itself, evidences delusional beliefs that something like that happened."

Nor was Housh prejudiced, under any standard, by exclusion of the report. Even if its admission led to evidence most favorable to the defense—that the victim had made prior false allegations of sexual abuse—such evidence would not have changed the outcome because the jury did not convict Housh of the sex offenses charged in the case. The jury learned from Dr. Moskowitz and the testimony about the victim's reports to police during her 2009 manic episode that she wrote things that made no sense, and was paranoid, delusional, and hypersexual, during that time. Before the parties received the December 2008 report, Moscowitz referred to it saying he had a note indicating that "she was starting to get revved up about then," becoming "edgy" and "accusing people of things." Given all of the evidence about the victim's manic episode, evidence that she was making delusional allegations in December 2008 could not have significantly affected the jury's impression of her.

*Id.* at *9-10.

### b. Applicable Federal Law

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). Furthermore, a violation of a state procedural law does not give rise to a claim cognizable on federal habeas corpus. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("'federal habeas corpus relief does not lie for errors of state law'") (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

It is well established that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), and "an opportunity for effective cross-examination," *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). But neither right is absolute. There is no requirement "that a defendant must be allowed to put on any evidence he chooses," *LaGrand v. Stewart*, 133 F.3d 1253, 1266 (9th Cir. 1998), or to cross-examination "that is effective in every way, and to whatever extent, the defense might wish," *Fensterer*, 474 U.S. at 20. States have

1   "broad latitude" to establish rules excluding evidence from criminal trials so long as the rules "are

2   not 'arbitrary' or 'disproportionate to the purposes they are designed to serve,'" *United States v.*

3   *Scheffer*, 523 U.S. 303, 308 (1998) (citations omitted), and trial courts retain "wide latitude" to

4   impose reasonable limits on cross-examination "based on concerns about, among other things,

5   harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

6   repetitive or only marginally relevant," *Fensterer*, 474 U.S. at 20.

7           A violation of the constitutional right to a meaningful opportunity to present a complete

8   defense, or of the constitutional right to an opportunity to cross-examine witnesses, is not enough

9   for federal habeas relief under § 2254.  State prisoners seeking federal habeas relief are not

10  entitled to relief unless the constitutional trial error "'had substantial and injurious effect or

11  influence in determining the jury's verdict.'"  *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v.*

12  *United States*, 328 U.S. 750, 776 (1946)).  In other words, federal habeas relief is limited to

13  constitutional error that resulted in "actual prejudice."  *Id.* (citation omitted).

                              **c.  Analysis**

15          In Claim 2, Petitioner argues that the trial court violated his rights to present a defense,

16  confrontation, and cross-examination by applying California Evidence Code § 352 to exclude

17  evidence of a December 2008 report by the victim's psychiatrist in which she reported her

18  husband, father, and stepfather had abused her in the past.  Dkt. No. 1 at 5.

19          First, to the extent Claim 2 alleges a violation of state law, such a claim fails because a

20  state evidentiary rule cannot be the basis for federal habeas relief.  *See Estelle*, 502 U.S. at 67-68.

21  As such, Petitioner may not challenge the trial court's evidentiary ruling on the grounds that it

22  violated the state's evidence code.  *See Jammal*, 926 F.2d at 919-20.  Further, the failure to

23  comply with a state's rules of evidence is neither a necessary nor sufficient basis for granting

24  federal habeas relief, and the presence or absence of a state law violation is irrelevant.  *Id.*; *see*

25  *also Estelle*, 502 U.S. at 67-68.

26          Furthermore, because the Supreme Court has never held that a trial court's exercise of its

27  discretion to exclude evidence, under a constitutionally sound evidentiary rule, violated a

28  defendant's constitutional right to present evidence, the state court's decision cannot be contrary to

1   or an unreasonable application of established Supreme Court authority.  *See Moses v. Payne*, 555

2   F.3d 742, 758-59 (9th Cir. 2009).  Although the Supreme Court has held that various restrictions

3   on a defendant's ability to cross-examine witnesses may violate the Confrontation Clause, it has

4   never held that the Confrontation Clause entitles a defendant to introduce extrinsic evidence,

5   including the testimony of other witnesses, for impeachment purposes.  *Nevada v. Jackson*, 569

6   U.S. 505, 512 (2013) (per curiam).

7        Here, Petitioner's proffered evidence was excluded under Section 352, a well-established

8   rule of evidence that permits a court to exercise its discretion in admitting evidence.  *See* Cal.

9   Evid. Code § 352.  The rule does not, in and of itself, abridge a defendant's right to present a

10   defense.  *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).  Because the Supreme Court has not

11   squarely addressed the issue whether a trial court's exercise of its discretion in this context

12   violates a defendant's constitutional rights to present a defense or to confront and cross-examine

13   witnesses, Petitioner is not entitled to federal habeas relief.  *Moses*, 555 F.3d at 758-60.

14        Even if Petitioner's claim were cognizable on federal habeas corpus, the state appellate

15   court reasonably rejected it.  As discussed above, Petitioner sought to introduce evidence from the

16   December 2008 report of the victim's allegations of prior abuse by her husband, father, and

17   stepfather, "arguing that they exhibited 'fantastical thinking' by the victim 'about men and about

18   abuse.'"  *Housh*, 2015 WL 1982695, at *8.  The trial court allowed Petitioner to pursue the

19   allegations involving the stepfather but Petitioner chose not to do so, thereby leaving only the

20   allegations regarding the husband and father at issue.  *Id.* at *9.  In ruling on whether to exclude

21   the evidence as to the remaining allegations, the trial court noted that "the report referred only to

22   inappropriate remarks by the father, and did not identify any of the abuse that may have been

23   inflicted by the husband."  *Id.*  Further, it determined that the victim never sent any of the letters

24   referenced in the report and did not report any of these allegations to law enforcement or other

25   appropriate authority.  *Id.*  The trial court thus prohibited Petitioner from eliciting testimony about

26   the allegations in the report involving the husband and father based on their lack of probative

27   value.  *Id.*  In reaching this conclusion, the trial court explained it saw nothing in the report "that

28   gives rise to even a hint that there is a potential conclusion that [the victim] made false

United States District Court
Northern District of California

1    allegations." *Id.*  It also found that the "unfairness in terms of the speculation that would be

2    invited against the alleged victim here is undue prejudice." *Id.*  In sum, the trial court summarized

3    the proffered evidence as follows: "What we have here is a medical report in which she tells the

4    doctor that she wrote letters to nobody, for nobody that were delivered to nobody.  They seem to

5    be some sort of letters that she wrote to vent . . . ." *Id.*  The state appellate court rejected

6    Petitioner's claim, finding that the trial court could reasonably conclude that the December 2008

7    report had "negligible probative value" and that it, "without more, would only invite speculation

8    by the jury about the abuse involved and whether it occurred." *Housh*, 2015 WL 1982695, at *10.

9           The Court finds, based on the record, that the December 2008 report cannot reasonably be

10   construed to establish that the allegations of prior abuse were false so as to constitute evidence

11   "material, and . . . vital to the defense" for purposes of finding constitutional error. *Jackson v.*

12   *Nevada*, 688 F.3d 1091, 1096 (9th Cir.2012).  At best, the report contained information relevant to

13   Petitioner's defense that the victim fabricated the allegations of abuse.  However, a defendant

14   "'does not have an unfettered right to offer [evidence] that is incompetent, privileged or otherwise

15   inadmissible under standard rules of evidence.'" *Egelhoff*, 518 U.S. at 42-43.  Moreover, as

16   Respondent notes, "the trial court let defense counsel review and investigate Dr. Moskowitz's

17   December 2008 report, but not delve into some of its details before the jury without a more

18   definite and relevant foundational base.  That ruling was reasonable." Dkt. No. 40-1 at 27.  The

19   Court agrees and finds objectively reasonable the state appellate court's rejection of this claim

20   because the December 2008 report had negligible probative value and was inconclusive as to the

21   key question of whether the allegations were false. *Cf. Walters v. McCormick*, 122 F.3d 1172,

22   1177 (9th Cir. 1997) (exclusion of tangential, non-probative evidence did not violate due process).

23          The state appellate court also reasonably determined that Petitioner was not prejudiced,

24   "under any standard, by exclusion of the report." *Housh*, 2015 WL 1982695, at *10.  A violation

25   of the right to present a defense merits habeas relief only if the error was likely to have had a

26   substantial and injurious effect on the verdict. *See Brecht*, 507 U.S. at 637.  That cannot be said

27   here because the jury did not convict Petitioner of the sex offenses charged.  Thus, "[e]ven if

28   admission of the report led to evidence most favorable to the defense—that the victim had made

prior false allegations of sexual abuse—such evidence would not have changed the outcome . . . ." *Housh*, 2015 WL 1982695, at *10. Therefore, any error in excluding the evidence was not prejudicial, and thus was harmless. *Brecht*, 507 U.S. at 637.

Accordingly, Petitioner is not entitled to federal habeas relief on Claim 2, and it is denied.

### 3. Claim 3: Victim's References to Petitioner's Custodial Status and Prior Imprisonment

Petitioner claims the trial court erred when it denied his motions for a mistrial after the victim testified about his custodial status at the time of trial and his prior imprisonment. Dkt. No. 1 at 6.

### a. State Court Opinion

The state appellate court described the factual background of this claim as follows:

(1) *Record*
The court granted Housh's motions to exclude any reference to the fact that he was in custody, to bifurcate the trial of the prior conviction enhancements, and to require the prosecution to advise its witnesses of the court's rulings on his in limine motions.

On direct examination, the victim testified that Housh sent her a letter on April 28, 2012. When the prosecutor asked her how she knew the letter was from Housh, she answered: "It has his name as a return address with the address of the Marin County Jail." The defense objected, and the court told the jury to "[d]isregard the location where the defendant—where the Witness stated the mail came from on April 28th of this year." Defense counsel said, "I don't think that admonition is sufficient," and asked to be heard outside the presence of the jury. The court said it would take up the matter during the next break.

During the break, Housh moved for a mistrial based on violation of the in limine exclusion of evidence of his custodial status. The prosecutor apologized for what she said was a "complete accident," explaining that she expected the victim to authenticate the letter by saying that it had Housh's name on it, and she recognized his handwriting. The prosecutor said she had instructed the victim not to refer to Housh's prior convictions, but said, "I don't know if I specifically told her not to mention his custody status."

The court denied the motion for a mistrial, stating: "I don't think the prejudice to the defendant is substantial, and with an additional curative instruction I think that the prejudice can be eliminated and we can assure ourselves that the jury will not consider his custody status for purposes of deciding the issues in this case."

Before the victim's testimony resumed, the court gave the following admonition: "[L]et me remind the jury of the last admonition I gave. [¶] When we neared the end of Ms. Doe's direct examination, there was some testimony about her receiving a letter with a certain return address on it, and I struck that testimony; that is, that return address, and I have ordered and admonished you to not consider that testimony for any purpose. [¶] I will go a step further now and admonish you, also, not to speculate in any respect as to the defendant's whereabouts at the time of that April 28th letter, or, for that matter, any time before or after that date. Where he was on that date is completely irrelevant to the issues in this case and . . . your decision-making process. [¶] It has nothing to do with the charges

or the elements, and you are to disregard it and not let it affect you in any way.  Thank you."

During redirect examination, the prosecutor asked, "Did the defendant ever tell you why he would sodomize you instead of rape you?"  The victim answered, "Yeah.  He said, I am not going to put any more bruises on you because I don't want to go *back* to prison for a woman. And he said, I am going to sodomized (*sic*) you every time you fuck up."  (Italics added.) The defense objected, a recess was called, and Housh moved again for a mistrial, based on the earlier testimony about his custodial status, and the further testimony about his prior imprisonment.  The court denied the mistrial motion, finding that an instruction to the jury to disregard the question and answer that led to the prior prison reference would cure any significant prejudice to Housh.  The judge asked the defense if it wanted him to go "a little bit further," and instead instruct the jury that the victim "misspoke" when she talked about Housh going "back" to prison, and have her restate her answer without including that word. Defense counsel asked for the latter remedy, out of concern that an appellate court "would say that I had an alternative instruction that I failed to use."

After the recess, the court told the jury:

"I have another one of my admonishments for you, and I want to reference the last question and answer that were posed of Ms. Doe.

"The last question that was posed of Ms. Doe, the answer included a mistake, an error on the witness' part, that might have left you with an impression that would be improper.

"The question was: Did the defendant ever tell you why he would sodomize you instead of rape you.

"The answer: Yeah, he said I am not going to put any more bruises on you because I don't want to go back to prison for a woman, and then she continued with another portion of the answer.

"The word 'back' was a mistake, and that is the mistake that might leave you with the impression, wrongfully so, that the defendant has ever been incarcerated before.  You are not to speculate about that.  You are not to conclude anything by her mistaken use of the word 'back.'

"I am going to give her a chance to answer that question again without that mistaken language in a moment so you can hear the answer that she meant to give.  It's important that you not speculate about the issue . . . that the use of that word might have drawn up in your minds.  Don't speculate about it and simply don't consider it for any purpose during the course of the trial or your deliberations."

The victim then testified that defendant said "he didn't want to put any bruises on me because he didn't want to go to prison for a woman."

*Housh*, 2015 WL 1982695, at *10-12.

The state appellate court then set forth the relevant law, and it denied this claim as follows:

(2) *Analysis*
"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged," and we apply "the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal. 4th 515, 555.) "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Avila* (2006) 38 Cal. 4th 491, 573.)

"A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice." (*People v. Ledesma* (2006) 39 Cal. 4th 641, 683.) However, the improper subject matter will rarely be "'of such a character that its effect . . . cannot be removed by the court's admonitions.'" (*People v. Allen* (1978) 77 Cal. App. 3d 924, 935.) Deciding "whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court." (*People v. Harris* (1994) 22 Cal. App. 4th 1575, 1581.) Reversal is required only if it is reasonably probable that the volunteered comment could have affected the outcome of the trial. (*Ibid.*)

The court here took pains to ensure that the jury would disregard the victim's passing references to Housh's custodial status and prior imprisonment. It instructed the jury to disregard her testimony about Housh being in jail, and had her withdraw her testimony about his imprisonment. It strongly admonished the jury not to consider the potentially prejudicial evidence, and we must presume that the jury followed those instructions. (*People v. Boyette* (2002) 29 Cal. 4th 381, 436.) The court could reasonably conclude that its remedial measures were sufficient to eliminate any significant prejudice Housh could have suffered from the isolated remarks.

In this respect, Housh's case is no different from others where references to the defendant's criminality were held to have been harmless. (*People v. Collins* (2010) 49 Cal. 4th 175, 197–199 (*Collins*) [affirming denial of a mistrial motion where defendant called witness collect every night "when he was still in Susanville before he got out in December"; the court "did not abuse its discretion in concluding that any prejudicial effect could be cured by an admonition"]; *People v. Avila, supra,* 38 Cal. 4th at pp. 572–574 [witness testified that he was told "don't do nothin', because [the defendant] barely got out of prison . . . [and was] crazy"; no abuse of discretion in denying a mistrial motion because the court admonished the jury not to consider the testimony for any purpose]; see also, *People v. Valdez* (2004) 32 Cal. 4th 73, 122–123 (*Valdez*) [rejecting claim of prosecutorial misconduct where witness testified that he obtained a picture of the defendant for a photo lineup when he "*went to the jail* and found a mug photo"; holding that "an admonition would have cured any prejudice"].)

Housh contends that *Collins* and *Valdez* are distinguishable because the victim here made two improper statements, whereas the witnesses in those cases made only one, but that difference is immaterial. Housh argues that *Collins* is distinguishable because the prosecutor in this case was guilty of misconduct, whereas the prosecutor in *Collins* was not. (*Collins, supra,* 49 Cal. 4th at p. 198 [no misconduct where the defense chose to pursue the line of questioning that led to the improper testimony].) But there was no prosecutorial misconduct here. Housh writes: "[T]he first motion for mistrial was prompted by the reference to appellant's custody status. The error was not inadvertent. The trial court had ordered the prosecutor to inform her witnesses not to discuss appellant's custody status, and the prosecutor admitted that she failed to inform [the victim] of the exclusionary order." However, while the prosecutor admitted she might not have told the victim to avoid referring to Housh's custodial status, she said she did advise her not to mention his prior convictions, so the omission as to custodial status appears to have been inadvertent. Moreover, the questions that produced the improper responses were not specifically aimed at eliciting them. (Compare, *Valdez, supra,* 32 Cal. 4th at p. 123 [no misconduct where prosecutor "merely asked [the witness] how he managed to get defendant's photograph in the photographic lineup, not necessarily where he got the photograph"], with *People v. Friend* (2009) 47 Cal. 4th 1, 33 [prosecutor committed misconduct by "directly posing a question [that] violated the trial court's prior evidentiary ruling"].)

*Id.* at *12-13.

### b.  Applicable Federal Law

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).

> Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions.  Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial."  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.

*Jammal*, 926 F.2d at 920 (citation and footnote omitted).[10]

The Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process.  *See Estelle*, 502 U.S. at 68-70.  *Estelle* left this question open.  *See id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").  When Supreme Court "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.'  Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized."  *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (alterations in original) (citation omitted) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006), and 28 U.S.C. § 2254(d)(1)).  The Ninth Circuit has recognized that the Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process.  *See Foy v. Gipson*, 609 F. App'x 903, 906-07 (9th Cir. 2015) (no habeas relief on claim that admission of propensity evidence showing that defendant assaulted another woman after he assaulted victim in that case violated defendant's right to due process, because *Estelle*'s reservation of the question as to whether propensity evidence violates due process "forecloses the conclusion that the state court's

---

[10] *Jammal* is one of the few cases that provides any guidance concerning the introduction of evidence that might result in fundamental unfairness.  The Ninth Circuit continues to use the *Jammal* "permissible inference" test in habeas cases governed by AEDPA.  *See, e.g., Noel v. Lewis*, 605 F. App'x 606, 608 (9th Cir. 2015) (admission of gang evidence did not violate due process); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008) (citing *Jammal* and concluding that evidence of prior bad acts did not violate due process).

1    decision was contrary to, or an unreasonable application of, clearly established federal law);

2    *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying habeas relief where trial

3    court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth

4    Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal

5    law under § 2254(d)); *Alberni v. McDaniel*, 458 F.3d 860, 865 (9th Cir. 2006) (denying habeas

6    relief on claim that due process was violated by admission of evidence of defendant's past violent

7    actions and explosive temper to show propensity based on the reservation in *Estelle*).

8           Even if an evidentiary error is of constitutional dimension, the court must consider whether

9    the error was harmless under *Brecht*.  *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

10                                   **c.   Analysis**

11          Petitioner claims that the trial court erred in denying his motions for a mistrial after the

12   victim testified about his custodial status at the time of trial and prior imprisonment.  Dkt. No. 1 at

13   6.  Petitioner also seems to make an additional claim of prosecutorial misconduct based on the

14   prosecutor's violation of the trial court's *in limine* order excluding this evidence.  *See id.*

15          Petitioner cannot demonstrate that the trial court's denial of his motions for a mistrial was

16   reversible error.  The admission of evidence is not subject to federal habeas review unless a

17   specific constitutional guarantee is violated or the error is of such magnitude that the result is a

18   denial of the fundamentally fair trial guaranteed by due process.  *See Henry*, 197 F.3d at 1031;

19   *Colley*, 784 F.2d at 990.  Because the Supreme Court has not yet made a clear ruling that

20   admission of irrelevant or overtly prejudicial evidence constitutes a due process violation, *see*

21   *Estelle*, 502 U.S. at 68-70, Petitioner must demonstrate that the evidence in question was so

22   arbitrary or so prejudicial that it rendered the trial fundamentally unfair, *see Henry*, 197 F.3d at

23   1031; *Colley*, 784 F.2d at 990.  Petitioner fails to do so.

24          Petitioner maintains that he was prejudiced by the victim's statements regarding his

25   custodial status and prior imprisonment.  However, the state appellate court reasonably determined

26   that any possible prejudice from the victim's statements was cured by the limiting instructions

27   given by the trial judge, explaining that "[t]he court could reasonably conclude that its remedial

28   measures were sufficient to eliminate any significant prejudice Housh could have suffered from

United States District Court
Northern District of California

31

the isolated remarks." *Housh*, 2015 WL 1982695, at *12. Juries are presumed to follow a court's limiting instructions regarding the purposes for which evidence is admitted, *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997), and Petitioner can point to no evidence indicating that the jurors at his trial ignored the judge's instruction. In addition, to the extent that Petitioner argues that such testimony regarding his custody status and prior imprisonment was improper propensity evidence, the Supreme Court has left open the question of whether such evidence violates due process. *See Estelle*, 502 U.S. at 75 n. 5. Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. *Alberni*, 458 F.3d at 866-67. Therefore, Petitioner is not entitled to habeas relief on this ground.

Finally, Petitioner has not demonstrated that the prosecutor engaged in misconduct. The Supreme Court has held that when reviewing a habeas claim of prosecutorial misconduct, the relevant inquiry is whether the prosecutor's actions "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). "Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (citations omitted). The state appellate court reasonably found that "there was no prosecutorial misconduct here" because "the questions that produced the improper responses were not specifically aimed at eliciting them." *Housh*, 2015 WL 1982695, at *13. The state appellate court noted that while the prosecutor told the victim not to mention Petitioner's prior imprisonment, she admitted she might not have told the victim to avoid referring to Petitioner's custody status. *Id.* Thus, the court reasonably found that any such omission "appear[ed] to have been inadvertent." *Id.* Moreover, because Petitioner cannot show that any alleged misconduct resulted in a trial so unfair that Petitioner was denied due process, he cannot demonstrate that he is entitled to relief. *See Darden*, 477 U.S. at 181.

In sum, the Court denies Petitioner's entire claim relating to the victim's statements regarding his custodial status at the time of trial and his prior imprisonment. The rejection of this claim by the state appellate court was neither contrary to nor an unreasonable application of

1   clearly established Supreme Court authority.  Accordingly, Petitioner is not entitled to habeas

2   relief on Claim 3.

3             **4.      Claim 4: Admission of Evidence of Prior Acts of Domestic Violence**

4             Petitioner claims that his due process and equal protection rights were violated by the trial

5   court's admission of evidence of his prior acts of domestic violence under California Evidence

6   Code § 1109 and, in the alternative, that such evidence should have been excluded under

7   California Evidence Code § 352.  Dkt. No. 1 at 6.

8                         **a.   State Court Opinion**

9   The state appellate court rejected Petitioner's claim as follows:

10  D. *Evidence of Domestic Violence Against Kim Doe*
    Housh contends that admission of Kim's testimony about his domestic violence against her
11  violated his constitutional rights to due process and equal protection, and was an abuse of
    discretion under Evidence Code section 352.  The court overruled his objection to her
12  testimony, finding that it was admissible under Evidence Code sections 1108 and 1109, and
    under Evidence Code section 1101, subdivision (b) "as showing a common plan or
13  scheme."[FN 2].

14              FN 2:  Since Housh was not convicted of the sexual assault charges, he does not
                contest admission of Kim's testimony under Evidence Code section 1108, which
15              allows evidence of a propensity to commit such offenses, nor does he challenge
                introduction of C.'s testimony, which was admitted under Evidence Code section
16              1108.

17  When a defendant is accused of an offense involving domestic violence, Evidence Code
    section 1109 provides for admission of other acts of domestic violence by the defendant "if
18  the evidence is not inadmissible pursuant to Section 352."  (Evid. Code, § 1109, subd.
    (a)(1).)  Evidence of acts occurring more than 10 years before the charged offense is
19  inadmissible "unless the court determines that the admission of this evidence is in the
    interest of justice."  (Evid. Code, § 1109, subd. (e).)
20
    When Kim's possible testimony was first discussed, the court tentatively ruled that the
21  evidence was admissible, stating: "The People's view relating to [Kim] that there is
    profound similarity in the present incident is shared with the Court in that we have what is
22  sometimes described as the classic domestic relationship, this courtship followed by a
    progression of abuse resulting in physical abuse but, most profoundly, here, culminating
23  ultimately in sexual abuse.  [¶]  The description is, perhaps, even chilling to see someone
    from 20 years ago describing conduct by the defendant that is being described in the present
24  time by the victim in this present case.  [T]he similarities carry with it some profound
    relevance and highly probative value in this case.  [¶] . . . [¶]  In my view, the relevance here
25  is so profound that it outweighs the prejudice and under no circumstances can I conclude,
    or would I conclude, that the prejudicial value substantially outweighs the probative value."
26
    The court later reaffirmed its tentative ruling, finding Kim's experiences with Housh
27  "similar, in a chilling way nearly," to those of the victim, "and those similarities also
    counterbalance the age of the case, the age or the remoteness, and the continued alleged
28  pattern here does establish the propensity and the character trait that is at issue here.  [¶]  So

                                                33

I think that the remoteness does not militate in favor of excluding the evidence."

We agree with the numerous cases that have rejected constitutional challenges such as those Housh raises to Evidence Code section 1109. (See, e.g., *People v. Brown* (2011) 192 Cal. App. 4th 1222, 1233, fn. 14; *People v. Price* (2004) 120 Cal. App. 4th 224, 240; *People v. Jennings* (2000) 81 Cal. App. 4th 1301, 1309–1313.)

We also conclude there was no abuse of discretion under Evidence Code section 352. Housh argues that "the prior acts were totally dissimilar to the charged crimes." However, like the victim, Kim testified that Housh did not begin physically abusing her until some months into their relationship. Like Kim, the victim testified that she eventually suffered such abuse consistently, over an extended period of time. Housh contends that Kim's abuse was too remote to be of probative value, but the court considered the passage of time and reasonably found that the "similarities between the prior and current acts . . . balanced out the remoteness." (*People v. Waples* (2000) 79 Cal. App. 4th 1389, 1395.)

The evidence of Housh's abuse of Kim was not unduly prejudicial. Kim's testimony about the nature of her physical abuse was far less inflammatory than that of the victim. Kim admitted telling prosecution investigator George that she could not remember much about the assaults, and that "[m]y brain has totally blocked it out." She did not testify to any details of the abuse other than saying that he would punch her, "open hand," and push her up against a wall. When she was asked, "What parts of his body would he use to hurt you?" she unresponsively answered, "Whatever part he could hit." The victim, in contrast, was far more explicit. She testified not only to being punched and shoved, but also to being slapped, kicked, pulled by the hair, thrown to the ground, karate-chopped in the neck, suffocated with a pillow, and jabbed under the toenails with a letter opener. The court could reasonably conclude that the probative value of Kim's testimony about Housh's domestic violence would not be substantially outweighed by its prejudicial effect.

*Housh*, 2015 WL 1982695, at *13-14.

### b.   Applicable Federal Law

The applicable federal law is the same as the law discussed at section 3 above entitled, "Claim 3: Victim's References to Petitioner's Custodial Status and Prior Imprisonment." *See supra* Discussion Part.III.B.3.b.

### c.   Analysis

Petitioner argues that Kim Doe's testimony regarding his prior acts of domestic violence was erroneously admitted in violation of his due process and equal protection rights. Dkt. No. 1 at 6.

Under the binding authorities outlined above, the state appellate court's rejection of Petitioner's claim does not warrant granting federal habeas relief under AEDPA, because a California trial court's admission of evidence pursuant to California Evidence Code § 1109 to show propensity does not violate any principle of clearly established federal law. *See Holley*, 568 F.3d at 1101. While no federal court has specifically ruled on the constitutionality of section

1109, several circuit courts have upheld the use of propensity evidence under Rules 413 and 414 of the Federal Rules of Evidence.  *See, e.g.*, *United States v. Castillo*, 140 F.3d 874, 881 (10th Cir. 1998); *United States v. Mound*, 149 F.3d 799, 801 (8th Cir. 1998).  The Ninth Circuit has upheld the constitutionality of Rule 414, permitting admission of evidence of similar crimes in child molestation cases.  *See United States v. LeMay*, 260 F.3d 1018, 1024-25 (9th Cir. 2001), *cert. denied*, 534 U.S. 1166 (2002).  The court held in *LeMay* that Rule 414 is not unconstitutional because it is limited in its function by Rule 403.  *Id.* at 1026-27.  Rule 403 directs judges to exclude any evidence submitted under Rule 414 that is substantially more prejudicial than probative.  *Id.* at 1027.  The court reasoned that this balancing mechanism eliminates any due process concerns from Rule 414 because, "[a]s long as the protections of Rule 403 remain in place to ensure that potentially devastating evidence of little probative value will not reach the jury, the right to a fair trial remains adequately safeguarded."  *Id.* at 1026.

The reasoning of *LeMay* applies equally to this case because the California rules are analogous to the federal rules.  The admission of evidence under section 1109 is limited by section 352.  *See* Cal. Evid. Code § 1109(a)(1).  Section 352 parallels Rule 403 of the Federal Rules of Evidence because it permits a trial judge to exclude evidence when its probative value is substantially outweighed by its prejudicial effect.  *See* Cal. Evid. Code § 352.  As the California Supreme Court held in *People v. Falsetta*, the requirement under section 352 to balance the prejudicial effect of the evidence against its probative value ensures that evidence admitted under section 1109 will not infringe on the right to a fair trial guaranteed under the Due Process Clause. 21 Cal. 4th 903, 913 (1999).

Finally, the Supreme Court has never held that the admission of propensity evidence violates the right to due process.  *See Estelle*, 502 U.S. at 75 n.5; *Alberni*, 458 F.3d at 864-67. Because habeas relief may not be granted unless the state court decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, *see* 28 U.S.C. § 2254, and there is no Supreme Court precedent on point, the decision of the state appellate court cannot be said to have contradicted or unreasonably applied clearly established federal law in upholding the constitutionality of section 1109, *see Alberni*, 458 F.3d at 866-67.

1    Accordingly, the state appellate court's decision regarding the admission of Petitioner prior acts of

2    domestic violence was not contrary to, or an unreasonable application of, clearly established

3    Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).

4          Even if Petitioner raised a cognizable claim, habeas relief would still be unavailable

5    because the admission of this evidence was not arbitrary "or so prejudicial that it rendered the trial

6    fundamentally unfair."  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  The admission of

7    evidence violates due process only if there are no permissible inferences that the jury may draw

8    from the evidence.  *See Jammal*, 926 F.2d at 920; *see also Terrovona v. Kincheloe*, 912 F.2d 1176,

9    1180-81 (9th Cir. 1990) (admission of prior bad act testimony did not violate due process where

10   trial court balanced probative weight against prejudicial effect and gave jury cautionary

11   instruction).  The state appellate court rejected Petitioner's arguments that the evidence should

12   have been excluded because "the prior acts were totally dissimilar to the charged crimes;" that

13   Kim Doe's abuse was too remote to have any real probative value; and that the testimony was

14   unduly prejudicial.  *Housh*, 2015 WL 1982695, at *14.  The state appellate court noted that in both

15   incidents, the victims testified that Petitioner's physical abuse did not begin until some months

16   after their relationships started and thereafter, they both eventually suffered such abuse

17   "consistently, over an extended period of time."  *Id.*  Because the court determined that Kim Doe's

18   testimony "was far less inflammatory than that of the victim[,]" it concluded that the admission of

19   this evidence was not unduly prejudicial.  *Id.*  Finally, the state appellate court found that the trial

20   court "could reasonably conclude that the probative value of Kim [Doe]'s testimony about

21   [Petitioner's] domestic violence would not be substantially outweighed by its prejudicial effect."

22   *Id.*  None of these conclusions were arbitrary, and none of the evidentiary rulings deprived

23   Petitioner of a fair trial.

24         In sum, the state appellate court's decision regarding the admission of Petitioner's prior

25   acts of domestic violence was not contrary to, or an unreasonable application of, clearly

26   established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).  Accordingly, Petitioner is not

27   entitled to federal habeas relief on Claim 4, and it is denied.

28

### 5.    Claims 5-7 and 10: Sentencing Errors

In Claims 5, 6, 7, and 10, Petitioner argues that the trial court committed various sentencing errors. Dkt. No. 1 at 7-9. In Claim 5, Petitioner contends that there was insufficient evidence presented at trial to sustain the trial court's finding that the Montana conviction qualified as a strike under California law. *Id.* at 7. In Claim 6, Petitioner argues that a jury, rather than the trial court, should have determined whether the Montana conviction qualified as a strike. *Id.* In Claim 7, Petitioner argues that the trial court violated California Penal Code § 654 in imposing consecutive sentences for Counts 3, 4, 7, and 8. *Id.* at 8. Finally, Claim 10 is difficult to decipher, but Petitioner seems to argue that his sentence was enhanced by a "false conviction." *Id.* at 9.

### a.    Claims 7 and 10: Unexhausted Sentencing Claims

Respondent points out that "[p]reliminarily, this Court may not grant relief on Claims 7 and 10 because they were never presented to the California Supreme Court." Dkt. No. 40-1 at 35-36 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999) (exhaustion requires presentation to highest state court where presentation is part of the state's ordinary appellate procedure); *Rose v. Lundy*, 455 U.S. 509, 519-520 (1982) (all federal claims in a habeas petition must first be exhausted in the state courts)). However, although Petitioner has failed to exhaust Claims 7 and 10, the Court may deny an unexhausted claim on the merits. *See* 28 U.S.C. § 2254(b)(2).

First, as to Claim 7, Petitioner claims that the trial court erred by imposing consecutive sentences for Counts 3, 4, 7, and 8, in violation of Section 654. Specifically, Petitioner contends that the sentence for these counts should be stayed pursuant to Section 654(a), which provides:

> An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.

Cal. Penal Code § 654(a). However, a claimed violation of state law, in this case Section 654, is not a valid basis for federal habeas relief. *Estelle*, 502 U.S. at 67-68; *Engle v. Isaac*, 456 U.S. 107, 119 (1982). Under 28 U.S.C. 2254(a), a writ of habeas corpus is available to a person in custody "only on the basis of some transgression of federal law binding on the state courts." *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle*, 456 U.S. at 119), *cert. denied*, 478 U.S.

1021 (1986).  Even if it is assumed that the trial court misapplied Section 654, the Ninth Circuit has held that the resulting error does not give rise to a cognizable federal claim.  *Watts v. Bonneville*, 879 F.2d 685, 687 (9th Cir. 1989) (claim premised solely on misapplication of Section 654 is not cognizable on federal habeas corpus); *see also Swarthout v. Cooke*, 562 U.S. 216, 218–20 (2011) (alleged violation of state law is not remediable on federal habeas review, even if state law were erroneously interpreted or applied).  The Ninth Circuit has also held more generally that "[t]he decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus."  *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  Accordingly, Petitioner is not entitled to relief on Claim 7 because he fails to allege any federal constitutional error.

Next, as to Claim 10, Petitioner's entire statement of this claim in his federal petition, which is difficult to decipher, states as follows:

> Claim [10]:  It was not raised in the opening appeal the Court illegally ebhanced [sic] the sentence in use a false conviction.

> Supporting Facts: It is doudle [sic] jeopaedy [sic] in using a case that's dismissed in Oakland Alameda 1981 PC 211 attemped [sic] robbery that dismissed in enhancement to double the sentence.  U.S. Surpeme [sic] Court report #) L ED 2d p596 [4].

Dkt. No. 1 at 9.  Respondent argues that this Court should reject this claim on the ground that it is in violation of the rule that habeas petitioners are expected to state specific facts which point to the real possibility of constitutional error.  Dkt. No. 40-1 at 39.  In the alternative, Respondent argues that Claim 10 "is sufficiently clear to show that it presents yet another challenge to [Petitioner's] sentence, which is not cognizable on federal habeas corpus."  *Id.*  This Court agrees with Respondent on both points.

Rule 4 of the Rules Governing Section 2254 in the United States District Courts "explicitly allows a district court to dismiss summarily the petition on the merits when no claim for relief is stated."  *Gutierrez v. Griggs*, 695 F.2d 1195, 1198 (9th Cir. 1983).  The Court construes Respondent's argument as a motion to dismiss because the facts alleged in Claim 10 do not entitle Petitioner to habeas relief.  *See O'Bremski v. Maass*, 915 F. 2d 418, 420 (9th Cir. 1990) (a habeas petitioner is expected to state facts showing the real possibility of constitutional error).  Claim 10

38

1    thus is dismissed because it fails to state facts that point to a "real possibility of constitutional

2    error." *See id.* (quoting *Blackledge v. Allison*, 431 U.S. 63 (1977)).

3         Moreover, as Respondent pointed out alternatively, federal habeas corpus relief is not

4    available for alleged violations of state sentencing laws.  *See, e.g.*, 28 U.S.C. § 2254(a) (federal

5    habeas relief is available only for "a violation of the Constitution or laws or treaties of the United

6    States"); *Richmond v. Lewis*, 506 U.S. 40, 50 (1992) (the question to be decided on federal habeas

7    corpus is not whether the state committed state-law error but whether the state court's action was

8    "so arbitrary or capricious" as to constitute an independent violation of the federal constitution).

9    "[S]tate courts are the ultimate expositors of state law," and a federal habeas court is bound by the

10   state's construction except when it appears that its interpretation is an obvious subterfuge to evade

11   the consideration of a federal issue.  *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975); *see also*

12   *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005).  So long as a state sentence "is not based

13   upon any proscribed federal grounds such as being cruel and unusual, racially or ethnically

14   motivated, or enhanced by indigency, the penalties for violations of state statutes are matters of

15   state concern." *Makal v. State of Ariz.*, 544 F.2d 1030, 1035 (9th Cir. 1976).  Thus, "[a]bsent a

16   showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does

17   not justify federal habeas relief." *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994).

18   Accordingly, Petitioner is also not entitled to relief on Claim 10 because he fails to allege any

19   federal constitutional error.

20                    **b.      Claim 5: Sufficiency of Evidence of Montana Prior**

21        Petitioner contends that the prosecution's evidence concerning his conviction in Montana

22   was insufficient to sustain the trial court's finding that it qualified as a "strike" under California

23   law.  Dkt. No. 1 at 7.  Even if this claim were cognizable on federal habeas corpus, the state

24   appellate court reasonably denied it.

25                          **i.      State Court Opinion**

26   The state appellate court described the factual background of this claim as follows:

27        (1) *Record*

28        The information resulting in the Montana conviction charged Housh, then going by the
         name Carlos Aguilar, with felony assault on August 3, 1996, "in that he purposely or

United States District Court
Northern District of California

knowingly caused bodily injury to John Alfred Christenson, Jr., by cutting him with a knife, in violation of Section 45–5–202(2), MCA." The Montana statute provided at the time in relevant part: "(2) A person commits the offense of felony assault if he purposely or knowingly causes: [¶] (a) bodily injury to another with a weapon; [¶] (b) reasonable apprehension of serious bodily injury in another by use of a weapon . . . ." (Mont. Code Ann. § 45-5-202) The trial court judgment in the case states that a jury found Housh "guilty of the offense charged."

He was sentenced in the judgment to serve two years in prison for the assault, and an additional two years under an enhancement statute for use of a weapon in committing the offense. (Former Mont. Code Ann. § 46-18-221.) The enhancement statute applied to "[a] person who has been found guilty of any offense and who, while engaged in the commission of the offense, knowingly displayed, brandished or otherwise used a firearm, destructive device, as defined in 45-8-3[3]2(1), or other dangerous weapon." (*State v. Wilson* (Mont. 1997) 936 P.2d 316, 317.)

The circumstances of the offense are described in a Montana Supreme Court opinion. (*State v. Aguilar* (Mont. 1999) 983 P.2d 345.) Housh was visiting the home of his ex-wife Kim and playing with their sons. Christenson, Kim's boyfriend, was upstairs sleeping. The boys told Housh that Christenson had verbally and physically abused them, and Kim confirmed the physical abuse. Housh then "confronted Christenson. He asked Christenson to go out onto the porch to talk to him. After some conversation, Housh grabbed Christenson by the throat and held him against the house. Christenson told Housh that he was cutting him, and Housh responded that 'that was what he intended to do.' He then told Christenson that if he ever mistreated his sons again he would kill him. [¶] . . . At trial, Christenson testified that he had a scratch on the neck, and was cut on the thumb. He testified that although he did not see a knife, Housh had held one to his throat. Housh maintained that he scratched Christenson on the neck with his fingernails, not a knife."

The court reversed Housh's weapon enhancement under the double jeopardy clause of the Montana Constitution because it punished him twice for using a weapon. (*State v. Aguilar, supra,* 983 P.2d at p. 347; see *State v. Guillaume* (Mont. 1999) 975 P.2d 312, 317 [the defendant "was subjected to double punishment for use of a weapon: once when the charge was elevated from misdemeanor assault to felony assault, and again when the weapon enhancement statute was applied"].)

*Housh*, 2015 WL 1982695, at *14-15.

The state appellate court then set forth the relevant law, and it denied this claim as follows:

(2) *Analysis*
California strike offenses include "any felony in which the defendant personally used a dangerous or deadly weapon." (§ 1192.7, subd. (c)(23).) Cutting someone's throat with a knife plainly qualifies. (See, e.g., *People v. Page* (2004) 123 Cal. App. 4th 1466, 1468, 1472 [defendant guilty of felony assault with a deadly weapon under § 245, subd. (a)(1) where his accomplice threatened the victim while holding a sharp pencil up to the victim's neck].)

Housh notes that a defendant could have been convicted of felony assault under paragraph (b) of the Montana statute merely by causing "reasonable apprehension of serious bodily injury in another by use of a weapon," rather than "bodily injury to another with a weapon" as provided in paragraph (a), and he cites cases for the proposition that a conviction based upon an apprehension of serious injury under paragraph (b) did not necessarily require that a weapon actually be used. (*State v. Hagberg* (Mont. 1996) 920 P.2d 86, 89–90 [victim reasonably feared serious bodily harm from a weapon before seeing that the defendant was holding a gun] ); (*State v. Misner* (Mont. 1988) 763 P.2d 23, 25 [victim reasonably feared

serious bodily harm even though he did not see the defendant waving his gun].)[FN 3]  "If the record does not disclose any of the facts of the offense actually committed, the court will presume the prior conviction was for the least offense punishable under the foreign law." (*People v. Mumm* (2002) 98 Cal. App. 4th 812, 816.)

FN 3:  Housh also relied on *State v. Smith* (Mont. 2004) 95 P.3d 137 in his opening brief, but then in his reply brief criticizes the People for discussing the case, arguing that the case is "irrelevant" because it applied an expanded version of the Montana statute enacted after he was prosecuted.

The record here showed beyond a reasonable doubt that Housh was convicted under paragraph (a) of the statute, not (b).  He was charged in the information with cutting the victim with a knife, not merely putting the victim in fear.  He was, according to the judgment, convicted of the "offense charged."  The Montana Supreme Court's opinion showed that cutting the victim's throat with a knife was in fact the conduct for which Housh was convicted.  Housh admitted scratching the victim's throat but claimed to have done so with his fingernails, not a knife.  The verdict showed that the jury rejected that claim.  The record of the Montana conviction thus established that Housh was convicted of a prior offense that qualified as a strike under California law.

Housh argues that *People v. Woodell* (1998) 17 Cal. 4th 448 (*Woodell*), precludes consideration of the facts set forth in the Montana opinion because they were disputed. *Woodell* held that "appellate opinions, in general, are admissible as part of the record of conviction that the trier of fact may consider in determining whether a conviction qualifies under the sentencing scheme at issue." (*Id.* at p. 457.)  "If the appellate court did state the pertinent facts, a trier of fact is entitled to find that those statements accurately reflect the trial record." (*Ibid.*)  *Woodell* cautioned, however, that some appellate opinions might have little probative value.  The court "should carefully consider whether the opinion as a whole, including any factual statements, is probative on whether the conviction was based on a qualifying theory.  It should not simply admit any opinion containing relevant factual statements but only those probative on this specific issue.  For example, if the opinion refers to facts in a fashion indicating the evidence was disputed *and the factual issue unresolved,* that reference would have little, if any, tendency to show the basis of the conviction and would, alone, not justify admitting the opinion." (*Id.* at p. 460 (italics added).)  The facts in the Montana Supreme Court's opinion were properly considered because they showed that Housh was prosecuted on a qualifying theory, cutting the victim with a knife, and that the factual dispute over the point, whether the injuries were inflicted with fingernails or a knife, was resolved against him.

Housh argues that the court could not consider the facts in the Montana opinion because they were inadmissible hearsay.  However, the facts were admissible for the non-hearsay purpose of determining the crime for which he was convicted. (*Woodell, supra,* 17 Cal. 4th at p. 459.)  "The *Woodell* court made clear that appellate opinions introduced as part of the record of conviction to prove a strike may be admitted into evidence even though they may contain factual statements that are not independently admissible under the hearsay rule . . . . Opinions containing hearsay are admissible because they are not admitted to prove the truth of the hearsay statements.  The question before the fact finder when determining a strike allegation is not whether the defendant actually did the actions the opinion states he did, but instead is only whether the defendant's conviction was based on the facts needed to establish a strike." (*In re Richardson* (2011) 196 Cal. App. 4th 647, 665–666.)

*Id.* at *15-16.

## ii.      Applicable Federal Law

The Due Process Clause "protects the accused against conviction except upon proof

1   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

2   charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

3   evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a

4   rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim,

5   *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas

6   relief, *see id.* at 324.  The Supreme Court has emphasized that "*Jackson* claims face a high bar in

7   federal habeas proceedings." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam); *id.* at

8   655 (court of appeals "unduly impinged on the jury's role as factfinder" and failed to apply

9   deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find evidence

10  insufficient to support petitioner's conviction).  A federal court collaterally reviewing a state court

11  conviction does not decide whether it personally believes that the evidence established guilt

12  beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992); *see, e.g., Coleman*,

13  566 U.S. at 656 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so

14  insupportable as to fall below the threshold of bare rationality").  The federal court "determines

15  only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any*

16  rational trier of fact could have found the essential elements of the crime beyond a reasonable

17  doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of

18  fact could have found proof of guilt beyond a reasonable doubt has there been a due process

19  violation.  *Jackson*, 443 U.S. at 324.

20          If confronted by a record that supports conflicting inferences, a federal habeas court "must

21  presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any

22  such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at

23  326.  The court may not substitute its judgment for that of the jury.  *See Coleman*, 566 U.S. at 657

24  (court of appeals erred in finding no reasonable basis for jury's conclusion that petitioner had

25  specific intent to kill victim and force was used simply because there was no testimony describing

26  physical action by petitioner).  "'[I]t is the responsibility of the jury—not the court—to decide

27  what conclusions should be drawn from evidence admitted at trial.'" *Parker v. Matthews*, 567

28  U.S. 37, 43 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)

United States District Court
Northern District of California

(court of appeals erred by substituting its judgment for that of California jury as to which side's expert witnesses more persuasively explained cause of death)).  Under *Jackson*'s standard of review, a jury's credibility determinations are entitled to near-total deference.  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations.  *See id.* (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination).

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference.  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the facts of the case.  *Coleman*, 566 U.S. at 651.  To grant relief, therefore, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable."  *Boyer v. Belleque*, 659 F.3d 957, 964-65 (9th Cir. 2011).

### iii.    Analysis

Under California's Three Strikes law, a defendant convicted of a felony is to receive "an indeterminate term of life imprisonment" if he "has two or more prior felony convictions as defined in subdivision (d)."  Cal. Penal Code § 667(e)(2).  Subdivision (d) provides, in relevant part:

> Notwithstanding any other law and for the purposes of subdivisions (b) to (i), inclusive, a prior conviction of a felony shall be defined as:
>
> (1) Any offense defined in subdivision (c) of Section 667.5 as a violent felony or any offense defined in subdivision (c) of Section 1192.7 as a serious Felony in this state.  The determination of whether a prior conviction is a prior felony conviction for purposes of subdivisions (b) to (i), inclusive, shall be made upon the date of that prior conviction and is not affected by the sentence imposed unless the sentence automatically, upon the initial sentencing, converts the felony to a misdemeanor.

Cal. Penal Code § 667(d).  In *People v. Fuhrman*, 16 Cal. 4th 930 (1997), the California Supreme Court rejected an argument that Penal Code § 667(d) is ambiguous because it does not contain an explicit requirement that prior convictions must have been "brought and tried separately."  The

state supreme court explained that:

> Nothing contained in the foregoing general statutory language suggests that when a defendant has sustained a prior conviction for an offense designated as a violent or serious felony, the prior conviction may be counted as a strike for purposes of sentencing under the Three Strikes law only if the prior conviction was for an offense that was "brought and tried separately" from another offense that also qualified as a violent or serious felony.

*Fuhrman*, 16 Cal. 4th at 938.  The state supreme court also rejected an argument that the term conviction is used in a nonuniform manner in the Three Strikes law, with the result that the term "prior conviction" in § 667(d) is ambiguous.  *Id.* at 938-40.  The state supreme court thus held that more than one strike could arise from a prior case in which multiple felony counts were adjudicated.  *Id.*

Whether *Fuhrman* should apply in Petitioner's case and whether the use of "prior conviction" in Penal Code § 667(d) is ambiguous are questions of state sentencing law not cognizable on federal habeas corpus.  *See, e.g.*, *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994); *Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989); *see also Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979) (the state's highest court is the final authority on the law of that state).  To the extent that Petitioner claims that § 667(d) is unconstitutionally vague and violates due process, that claim fails.  The California Supreme Court held in *Fuhrman* that § 667 "is unambiguous in providing that prior felony convictions need not have been brought and tried separately in order to qualify as strikes," and for that reason rejected the argument that the statute is vague and fails to provide fair warning as to what constitutes a strike.  *Id.* at 939-40 & n. 9 (relying, *inter alia*, on *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  Under *Kolender*, a penal statute, as drafted and construed by the state courts, must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  461 U.S. at 357-58.  This Court concludes that the analysis in *Fuhrman* is neither contrary to nor an unreasonable application of clearly established federal law as set forth in *Kolender*.  Therefore, the Court finds that Petitioner is not entitled to relief on this ground.

Accordingly, Petitioner is not entitled to federal habeas relief on Claim 5, and it is denied.

United States District Court
Northern District of California

44

### c.     Claim 6: Jury Trial on Montana Conviction as Felony Strike

Petitioner contends that he was entitled to a jury trial on the question of whether his Montana conviction constituted a strike under California law.  Dkt. No. 1 at 7.  Again, even were this claim cognizable on federal habeas corpus, the state appellate court reasonably denied it.

### i.     State Court Opinion

The state appellate court set forth the relevant state and federal law and denied this claim as follows:

> F. *Right to a Jury Trial on the Montana Prior*
> Housh argues that the court erroneously denied his request to have the jury decide whether his Montana conviction constituted a strike.  In so ruling, the court followed the holding of *People v. McGee* (2006) 38 Cal. 4th 682, 686, 708–709 (*McGee*), that a defendant has no right to a jury trial of that issue under the reasoning of *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), or *Shepard v. United States* (2005) 544 U.S. 13 (*Shepard*).
>
> Housh contends that *McGee* has been abrogated by the Supreme Court's decision in *Descamps v. United States* (2013) —— U.S. ——, 133 S. Ct. 2276 (*Descamps*),[11] a case interpreting the Armed Career Criminal Act (ACCA) (18 U.S.C. § 924(e)).
>
> The ACCA "increases the sentences of certain federal defendants who have three prior convictions 'for a violent felony,' including 'burglary, arson, or extortion.'  To determine whether a past conviction is for one of those crimes, courts use what has become known as the 'categorical approach':  They compare the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime—i.e., the offense as commonly understood.  The prior conviction qualifies as an ACCA predicate only if the statute's elements are the same as, or narrower than those of the generic offense."  (*Descamps*, *supra*, 133 S. Ct. at 2281.)
>
> A "modified categorical approach" is used "when a prior conviction is for violating a so-called 'divisible statute.'  That kind of statute sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building or an automobile.  If one alternative (say, a building) matches an element of the generic offense, but the other (say, an automobile) does not, the modified categorical approach permits sentencing courts to consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction."  (*Descamps, supra,* 133 S. Ct. at p. 2281.)
>
> *Descamps* noted that the modified categorical approach was properly applied in *Shepard, supra,* 544 U.S. 13, which involved a divisible Massachusetts burglary statute that covered entries into boats and cars, as well as the "generic burglary" of entry into a building.  (*Descamps, supra,* 133 S. Ct. at p. 2284; *Shepard, supra,* at pp. 15–16.)  *Shepard* held that, to determine whether the defendant had committed a generic burglary, the court could examine the "terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the pleas was confirmed by the defendant, or . . . . some comparable judicial record of this information."  (*Shepard* at p. 26)  However, the court could not examine "police reports or complaint

---

[11] This Supreme Court case has since been published in the United States Reports: *Descamps v. United States*, 570 U.S. 254, 133 S. Ct. 2276 (2013).

applications" (*id.* at p. 16) that went "beyond conclusive records made or used in adjudicating guilt" (*id.* at p. 21). Doing so could lead to "a disputed finding of fact about what the defendant and state judge must have understood as the factual basis of the prior plea" that implicated the defendant's jury trial right under *Apprendi*. (*Id.* at p. 25.) "The rule of reading statutes to avoid serious risks of unconstitutionality [citation], therefore counsel[ed the court] to limit the scope of judicial fact finding on the disputed generic character of a prior plea . . . ." (*Id.* at pp. 25–26.)

*Descamps* held that the modified categorical approach could not be used "when a defendant was convicted under an 'indivisible' statute—i.e., one not containing alternative elements— that criminalizes a broader swath of conduct than the relevant generic offense." (*Descamps, supra,* 133 S. Ct. at pp. 2281, 2283.) In part, such judicial fact finding would implicate the defendant's jury trial right. "[T]he court's finding of a predicate offense . . . would (at the least) raise serious Sixth Amendment concerns if it went beyond merely identifying a prior conviction. Those concerns, we recognized in *Shepard,* counsel against allowing a sentencing court to 'make a disputed' determination 'about what the defendant and state judge must have understood as the factual basis of the prior plea,' or what the jury in a prior trial must have accepted as the theory of the crime." (*Descamps, supra,* at p. 2288.) The "elements, not facts," of the crime control whether it qualifies as an ACCA predicate. (*Id.* at p. 2283.)

*Descamps* does not call into question the trial court's determination in Housh's case, or effectively overrule *McGee*. *Descamps* identifies no constitutional concerns with judicial examination of the record of a prior conviction under a divisible statute like the Montana assault law to determine whether the elements of the crime qualified it as a strike.

We reject Housh's claim that *Descamps* abrogated *McGee* for the same reasons *McGee* concluded that *Shepard* did not disapprove its analysis: "Although the *Shepard* decision may suggest that a majority of the high court would view the legal issue presented in the case before us as presenting a serious constitutional issue, the high court's decision did not purport to resolve that issue. The issue before the high court in *Shepard* was resolved as a matter of statutory interpretation, and the court did not purport to decide whether a state is constitutionally precluded from permitting a court to conduct the kind of examination of the record of a prior criminal proceeding that occurred in the case before us in determining whether a conviction constitutes a qualifying prior conviction for purposes of enhancements under a state sentencing statute." (*McGee, supra,* 38 Cal.4th at p. 708.)

The trial court did not engage in impermissible fact-finding to conclude that Housh's Montana conviction qualified as a strike under California law. The charging document alleged Housh cut his victim with a knife. The verdict found him guilty as charged. Permissible review of these documents as provided in *Shephard* leads to one conclusion. Housh assaulted his victim in the Montana case by cutting him with a knife and not on the alternate basis of causing an apprehension of serious bodily injury.

*Housh*, 2015 WL 1982695, at *16-17 (footnote added).

### ii.      Analysis

Petitioner argues that his Sixth Amendment right to a jury trial regarding his prior conviction, as set forth in *Apprendi v. New Jersey*, was violated when the state court concluded that his prior conviction in Montana was a serious felony under California law sufficient to constitute a strike. Dkt. No. 1 at 7. Specifically, Petitioner contends that he was entitled to a jury

46

1    determination as to how the offense underlying that prior conviction—defined by a divisible

2    statute—was committed and whether a weapon was used within the meaning of California law.

3    *Id.*

4          First, assuming arguendo that the state court erred in finding Petitioner's prior Montana

5    conviction constituted a serious felony, this would constitute an error of state sentencing law,

6    which does not warrant federal habeas relief. *See Estelle*, 502 U.S. at 67-68.

7          Second, even if this sentencing error claim were cognizable on federal habeas corpus, the

8    state appellate court reasonably denied this claim and held that Petitioner was not entitled to have

9    a jury determine that his Montana conviction qualified as a strike under California law. *Housh*,

10   2015 WL 1982695, at *16-17.  Under California law, if it is necessary to review the record of a

11   prior criminal proceeding in order to determine whether a prior conviction qualifies under

12   California's various sentencing enhancement statutes, the responsibility for this inquiry falls upon

13   the court, rather than the jury. *See McGee*, 38 Cal. 4th at 686, 708-709.  The California Supreme

14   Court held that the court's conducting this inquiry does not violate the federal constitutional right

15   to a jury identified in *Apprendi*. *Id.* at 685, 714-15 (finding no *Apprendi* violation in trial court's

16   reviewing record of prior conviction and determination that prior conviction was a "serious

17   felony" and as such qualified as a strike under California law).  While Petitioner argued on appeal

18   that *McGee* has been abrogated by *Descamps v. United States*, 570 U.S. 254 (2013), a case

19   interpreting the Armed Career Criminal Act (ACCA) (18 U.S.C. § 924(e)), the state appellate

20   court recognized that *Descamps* did not overrule *McGee* or identify any constitutional requirement

21   that a jury must determine whether a California defendant's prior conviction, whether suffered in

22   California or in another state, qualifies as a felony strike. *Housh*, 2015 WL 1982695, at *17.  No

23   Supreme Court case imposed a requirement that there is a jury right on this question.

24   Accordingly, the state appellate court's rejection of Petitioner's claim was neither an unreasonable

25   application of, nor contrary to, clearly established federal law. *See Carey*, 549 U.S. at 77 (where

26   Supreme Court precedent gives no clear answer to question presented, "it cannot be said that the

27   state court 'unreasonab[ly] appli[ed] clearly established Federal law'").

28         Accordingly, Petitioner is not entitled to federal habeas relief on Claim 6, and it is denied.

### 6.    Claim 8: Denial of New Trial Motion

Petitioner contends that the trial court committed prejudicial error in denying Petitioner's motion for a new trial in light of newly discovered evidence.  Dkt. No. 1 at 8.

### a.   State Court Opinion

The state appellate court rejected Petitioner's claim as follows:

H. *New Trial Motion*
Finally, Housh contends that the court erred when it denied his motion for a new trial based on newly-discovered evidence (§ 1181, subd. 8)—a receipt for purchase of a pool at Walmart on June 26, 2011.

As we have said, Housh's sisters testified that he was at Swearengin's home building a pool on June 27, 28, and 29, 2011, when he was accused of assaulting the victim.  Swearengin said that she bought the pool at Walmart with a debit card and cash, but that she could not find a receipt, and her bank could not find a debit card statement, for the purchase.

According to the declarations of defense counsel and defense investigator Lewis in support of the new trial motion, Swearengin kept receipts for her purchases in a large plastic container, and they had all looked unsuccessfully through the container for the Walmart receipt before trial.  Counsel declared that he had asked Swearengin for the account number of the debit card she used to buy the pool, but she could not provide it.  Lewis declared: "After the conclusion of trial, Ms. Swearengin's elderly mother moved in with Ms. Swearengin.  Ms. Swearengin cleaned out the hallway closet to make room for her mother's possessions.  Ms. Swearengin found the pool receipt in the hallway closet.  The receipt was sitting on the closet shelf underneath the large plastic storage container.  The receipt was not stored inside the container as it should have been."

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at trial; 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal. 4th 312, 328.)  "A new trial motion based on newly discovered evidence is looked upon with disfavor.  We will only disturb a trial court's denial of such a motion if there is a clear showing of a manifest and unmistakable abuse of discretion." (*People v. Mehserle* (2012) 206 Cal. App. 4th 1125, 1151.)

The trial court denied Housh's motion on the grounds that the receipt could have been obtained with reasonable diligence prior to the trial by "going to Walmart, issuing subpoenas," and that "there is no reasonable chance that the result would be any different had that evidence been available at trial . . . .  It was a tangential piece of evidence that in the Court's view would not have overcome the overwhelming evidence as to those matters for which the defendant was convicted."

We hold that the trial court could reasonably find that the receipt would not have changed the outcome, and need not reach the issue of diligence on the part of the defense.  Housh's alibi defense rested on his sisters' testimony that he was away from the victim's home on the dates of the charged crimes.  His reason for leaving the house was, as the court observed, a tangential matter.  Whether he was building a pool or engaging in some other activity was immaterial.  The pool receipt was not such powerful corroboration that it likely would have altered the jury's view of the sisters' credibility.  Thus, denial of the new trial motion was

not an abuse of discretion.

*Housh*, 2015 WL 1982695, at *18-19.

### b.  Analysis

There is no statutory right to a new trial or an evidentiary hearing under federal law. Petitioner's right to a new trial and an evidentiary hearing is a statutory right pursuant to Section 1181 of the California Penal Code.  *People v. Dillard*, 168 Cal. App. 2d 158, 167 (Cal. Ct. App. 1959).  The state appellate court rejected this claim based solely on state law grounds.  The state appellate court found that Petitioner did not meet the requirements under California law for a new trial due to newly discovered evidence, because the new evidence could have been discovered earlier with due diligence and because the new evidence would not have rendered a different result probable on retrial, citing to *People v. Delgado*, 5 Cal. 4th 312, 328 (Cal. 1993), and *People v. Mehserle*, 206 Cal. App. 4th 1125, 1151 (Cal. Ct. App. 2012).  *Housh*, 2015 WL 1982695, at *19. As previously explained, a violation of a state procedural law does not give rise to a claim cognizable on federal habeas corpus.  *See Estelle*, 502 U.S. at 67.  Thus, the state appellate court's denial of this claim is not subject to review in this federal habeas proceeding unless the denial was so fundamentally unfair it constitutes a due process violation.  *See Holley*, 568 F.3d at 1101.

To establish a due process violation, a petitioner must show that the state court's denial of his new trial motion was so prejudicial that it rendered his state court proceedings fundamentally unfair.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) ("While a petitioner for federal habeas relief may not challenge the application of state [court] rules, he is entitled to relief if the [state court's] decision created an absence of fundamental fairness that 'fatally infected the trial.'"); *see also Gordon v. Duran*, 895 F.2d 610, 615 (9th Cir. 1990) ("the mere existence of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for federal habeas relief.  More is needed.  It must be shown that the newly discovered evidence would probably have resulted in the defendant's acquittal.") (internal citations omitted).  Any alleged constitutional error is subject to a harmless error analysis.  *Fry v. Pliler*, 551 U.S. 112, 116 (2007). Under that standard, an error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."  *Id.*  Applying this standard, Petitioner's claim fails.  As the

United States District Court
Northern District of California

state appellate court explained, the evidence submitted by Petitioner in support of the new trial

motion went to a tangential matter:

> Housh's alibi defense rested on his sisters' testimony that he was away from the victim's
> home on the dates of the charged crimes. His reason for leaving the house was, as the court
> observed, a tangential matter. Whether he was building a pool or engaging in some other
> activity was immaterial. The pool receipt was not such powerful corroboration that it likely
> would have altered the jury's view of the sisters' credibility.

*Housh*, 2015 WL 1982695, at *19. Because the evidence had marginal probative value (at most),

any error in denying the new trial motion did not have a substantial or injurious effect on the

verdict. *See Brecht*, 507 U.S. at 637.

Accordingly, Petitioner is not entitled to habeas relief on Claim 8, and it is denied.

### 7.    Claim 9: Cumulative Error

In his final claim, Petitioner claims he was prejudiced by the cumulative effect of the

foregoing asserted errors. Dkt. No. 1 at 9. In some cases, although no single trial error is

sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still

prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334

F.3d 862, 893-95 (9th Cir. 2003). Where there is no single constitutional error existing, nothing

can accumulate to the level of a constitutional violation. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th

Cir. 2011). Here, no constitutional error occurred.

Accordingly, Petitioner is not entitled to relief under the cumulative error doctrine, and

Claim 9 is denied.

## IV.    CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court

that issues an order denying a habeas petition to either grant or deny therein a certificate of

appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a

substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

certificate must indicate which issues satisfy this standard, *id.* § 2253(c)(3). "Where a district

court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

United States District Court
Northern District of California

court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## V.    CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

Dated: 2/8/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California